COMMONWEALTH OF PUERTO RICO
et al., Plaintiffs, Appellees,

v.

The SS ZOE COLOCOTRONI, her
Engines, Appurtenances, etc., et
al., Defendants, Appellants.

Nos. 78–1543, 79–1468.

United States Court of Appeals,
First Circuit.

Argued March 10, 1980.

Decided Aug. 12, 1980.

---

Owen McGivern, New York City, with whom John W. Wall, Peter S. Dealy, Gary B. Schmidt, Donovan, Leisure, Newton & Irvine, Daniel J. Dougherty, Mary Louise Montgomery, Kirlin, Campbell & Keating,

New York City, Leo F. Glynn, Richard A. Dempsey, and Glynn & Dempsey, Boston Mass., were on brief, for defendants, appellants.

Nicolas Jimenez, San Juan, P.R., with whom William A. Graffam and Jimenez & Fuste, San Juan, P.R., were on brief, for plaintiffs, appellees.

Kenneth S. Kamlet, Elizabeth F. Kroop, Washington D.C., Marshall Coleman, Atty. Gen., Washington, D.C., Timothy G. Hayes, Asst. Atty. Gen., Richmond, Va., Commonwealth of Virginia, Francis X. Bellotti, Atty. Gen., Stephen M. Leonard, Asst. Atty. Gen., Boston, Mass., Commonwealth of Massachusetts, Richard S. Cohen, Atty. Gen., Cabanne Howard, Asst. Atty. Gen., Augusta, Maine State of Maine, Jim Smith, Atty. Gen., Martin S. Friedman, Asst. Atty. Gen., Tallahassee, Fl., State of Florida, Mark White, Atty. Gen., Douglas Caroom, Asst. Atty. Gen., Austin, Tex., State of Texas, Stephen H. Sachs, Atty. Gen., John B. Griffith, Asst. Atty. Gen., Annapolis, Md., State of Maryland, Rufus L. Edmisten, Atty. Gen., William Raney, Asst. Atty. Gen., Raleigh, N.C., State of North Carolina, Robert Abrams, Atty. Gen., Beryl Kuder, Asst. Atty. Gen., New York City, State of New York, Sarah Chasis, and Jane Bloom, New York City, on brief, for The National Wildlife Federation, et al., as amici curiae.

Jose A. Quiles, U.S. Atty., San Juan, P.R., Alice Daniel, Asst. Atty. Gen., Eldon V. C. Greenberg, Gen. Counsel, Michael A. Levitt, Atty., National Oceanic and Atmospheric Administration, William Kanter, and Allen van Emmerik, Attys., Dept. of Justice, Civil Division, Washington, D.C., on brief, for the United States of America, as amicus curiae.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

In the early morning hours of March 18, 1973, the SS ZOE COLOCOTRONI, a tramp oil tanker, ran aground on a reef three and a half miles off the south coast of Puerto Rico. To refloat the vessel, the captain ordered the dumping of more than 5,000 tons of crude oil into the surrounding waters. An oil slick four miles long, and a tenth of a mile wide, floated towards the coast and came ashore at an isolated peninsula on the southwestern tip of the island—a place called Bahia Sucia. The present appeal concerns an action in admiralty brought by the Commonwealth of Puerto Rico and the local Environmental Quality Board (EQB) to recover damages for harm done to the coastal environment by the spilled oil.[1]

Defendants[2] have raised numerous objections to the district court's judgment awarding plaintiffs $6,164,192.09 in damages for cleanup costs and environmental harm. The primary objections are that the district court: (1) abused its discretion in striking defendants' pleadings on the issue of liability as a sanction for defendants' conduct during the discovery process; (2)

---

* Of the District of Massachusetts, sitting by designation.

1. Several other actions that were initially consolidated with this one have been settled or adjudicated. The United States recovered $840,366.01 in cleanup costs, interest and statutory penalties against the owners of the oil tanker; we refused to enlarge this award by adding attorney's fees and additional prejudgment interest. *United States v. M/V Zoe Colocotroni*, 602 F.2d 12 (1st Cir.1979). Local fishermen and owners of a nearby salt pond settled their claims for property damage and lost income for $55,000 and $75,000 respectively. A local hotel's claim for riparian damages and loss of business was also settled, for $13,500.

2. Defendants in this action are the SS ZOE COLOCOTRONI (in rem); the owners–Marbonanza Compania Naviera, S.A., Colocotroni, Ltd., and/or Colocotroni Brothers, S.A.; and the insurance underwriters–the West of England Ship Owners Mutual Protection and Indemnity Association (hereinafter West of England–Luxembourg) and the West of England Ship Owners Mutual Insurance Association (hereinafter West of England–London). The two West of England firms (hereinafter collectively West of England) were sued under Puerto Rico's direct action statute, 26 L.P.R.A. § 2003, as insurers of the ZOE COLOCOTRONI and her owners. West of England's contention that the district court lacked personal jurisdiction over the two firms is discussed in Part IV *infra*.

erred in considering depositions of the ship's master and crew on the issue of liability and in making findings as to liability after that issue had been removed from the case; (3) lacked personal jurisdiction over the underwriters West of England–Luxembourg and West of England–London; (4) erred in finding plaintiffs had standing to sue for environmental damages; (5) applied the wrong standard in measuring damages; (6) made certain erroneous findings of fact on damages; and (7) erred in denying defendants' Rule 60 motion for relief from judgment.[3] The facts and circumstances of the oil spill and its aftermath are set forth in detail in the district court's opinion, *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 456 F.Supp. 1327 (D.P.R. 1978). After a brief review of these facts and of the trial testimony, we will address defendants' contentions in turn.

## I.

The following facts found by the district court are not in serious dispute. On March 15, 1973, the ZOE COLOCOTRONI departed La Salina, Venezuela, carrying 187,670 barrels of crude oil en route to Guayanilla, Puerto Rico. For the first two days of the voyage, the vessel proceeded by celestial navigation. The last star fix, however, was taken at 1859 hours on March 17. For the next eight hours, the ship proceeded by dead reckoning. As the vessel approached the south coast of Puerto Rico, it was, the district court stated, "hopelessly lost." At 0300 hours on March 18, the ship grounded on a reef. Efforts to free the tanker by alternately running the engines in forward and reverse were unsuccessful. After ten minutes, the captain ordered the crew to lighten ship by emptying the cargo of crude oil into the sea.[4] By the time the vessel refloated, some 1.5 million gallons of crude oil–5,170.1 tons–had poured into the surrounding waters.

The oil floated westward from the site of the spill throughout the daylight hours of March 18, and begun coming ashore after nightfall. Bahia Sucia is a crescent–shaped bay facing southeastward from the Cabo Rojo peninsula, which forms the southwest tip of Puerto Rico. The oil entered Bahia Sucia, washed onto the beaches, and penetrated the mangrove forests that line the western edge of the bay. The oil was particularly thick in three areas: around the rocky tip of the peninsula, in a section of mangroves known as West Mangrove between a point called "Hermit One" and an inlet called "Dogman's Cove,"[5] and on the open beach area stretching along the northern edge of the bay. In addition, as the tide ebbed and flowed, oil entered the tidal flats behind the mangrove fringe, coating the roots of mangroves growing deeper in the forest and soaking into the sediments.

---

**3.** Defendants also argue that receipt by the Commonwealth of a $162,194 grant from the Environmental Protection Agency (EPA) for litigation expenses in connection with the Bahia Sucia oil spill constituted "maintenance" in the common law sense. In the alternative, defendants argue the amount of the grant should be set off against any recovery to which the plaintiffs may be entitled. These arguments are specious. *See generally* Corbin on Contracts § 1423 (no illegality in assisting another to maintain a suit by advancing the money to pay costs and expenses, even as a gift, if the advancement is made for reasons of charity or friendship and not for profit). Section 106(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1256(a), provides that EPA may grant funds to states "for the prevention, reduction, and elimination of pollution, including enforcement directly or through appropriate State law enforcement officers or agencies." The regulations define "enforcement" to include "litigation support activities." 40 C.F.R. § 35.1513–

5(c)(8). A statutorily authorized government grant intended to further the purposes of a valid statute does not constitute "maintenance" by the United States. *Cf. Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721, 727 (5th Cir. 1961) (Secretary of Labor's solicitation of minimum wage complaints pursuant to statutory scheme not "barratrous").

**4.** The captain was ultimately tried and convicted on a charge of violating 33 U.S.C. § 1321(b)(5) in connection with the dumping of the oil. 456 F.Supp. at 1333 n.9.

**5.** Two hermits–Hermit One and the Dogman–lived in the West Mangrove area at the time of trial, the Dogman being so called because of his large collection of canine acquaintances. Neither hermit claimed any legal interest in the property. Various local topographical features were identified in court by reference to these two eponymous individuals.

A massive cleanup operation, coordinated by the United States Coast Guard and several Commonwealth agencies, commenced on the morning of March 19. Cleanup crews, hampered to some extent by variable winds that blew oil back and forth across the bay, used booms to attempt to contain oil floating on the surface. Much of this oil was pumped out, either directly from the water or from large holes dug in the beach into which oil was channeled by the cleanup crews. By March 29, approximately 755,000 gallons of oil, or about half the amount spilled, had been recovered. On several occasions during the cleanup, oil was driven by winds and currents into the eastern edge of the bay in an area known as East Mangrove. This thin layer of oil was difficult to remove, but, according to the district court's findings, it caused little or no harm to the East Mangrove forest.

By April, cleanup activities had switched from large–scale removal of oil to small–scale activities such as manual beach cleanup and bailing of oil from tidal pockets with buckets and small boats. Large amounts of contaminated sands–totalling about 4,500 cubic yards–were removed from the beach area by bulldozer and by hand. At the end of April, the major remaining cleanup efforts were halted, and all further efforts were discontinued after September 24. Despite the cleanup, oil continued to be present in Bahia Sucia, especially in the stand of mangroves on the west side of the bay.

One of plaintiffs' expert witnesses, Dr. Ariel Lugo Garces, a wetlands specialist, testified that the ecological functions of a mangrove forest such as that at Bahia Sucia included: (1) protecting the shoreline from erosion, storms, tides, and high winds; (2) providing a habitat for wildlife, especially birds; (3) providing a protected breeding ground for fish and shellfish; and (4) acting as a food source for aquatic creatures of all

kinds. Dr. Roger D. Anderson, a marine biologist who testified for defendants, agreed with Dr. Lugo that tropical mangroves are an important link in the food chain that supports fisheries and other marine resources.

The district court described the Bahia Sucia mangroves as follows:

"The mangrove that borders on the ocean fringe throughout Bahia Sucia is a species referred to as red mangrove *(Rhizophora mangle)*. This mangrove has both main and prop roots, in which are located lenticels or pores for gas exchange. These lenticels facilitate root respiration. Various epibenthic species such as tree oysters, snails, crabs, sponges and molluscs dwelled in these root systems. In the waters surrounding these roots, communities of fish, shrimp and similar floating or swimming organisms throve. The bottom around the roots was inhabited by various benthic infauna. The bottom near the red mangrove was covered with both turtle grass . . . and manatee grass

. . . . .

Further inland from the fringe, as the interstitial salinity rises, the red mangrove is supplanted by the black mangrove *(Avecennia nitida)*. This mangrove inhabits a zone systematically flooded by the tide, and rather than prop roots, it has fingerlike breathing tubes (called neumatafors) which rise from the ground to above high water level. This area provided a habitat principally for crustaceans such as crabs and barnacles, and algae grazing snails, bees and reptiles. There were also benthic infaunal communities similar in nature to those in the bottom surrounding the red mangrove fringe."

456 F.Supp. at 1338 (footnotes omitted).[6] The district court noted that the configura-

---

6. In the district court, the terms "benthic infauna" and "infaunal creatures" were used to describe creatures such as worms or clams living in or under the sediment beneath the mangroves. The term "epibenthic" was used to describe creatures such as shrimp or crabs that

live just above the surface of the sediment, whether in or out of the water. While defendants have questioned the accuracy of this terminology on technical grounds, we believe the intended meaning of these terms is clear

tion of Bahia Sucia, together with the prevailing winds and currents, made the bay a natural trap for floating debris, including small quantities of petroleum and tar.[7] Nevertheless, the court found that, at the time of the ZOE COLOCOTRONI oil spill, "Bahia Sucia was a healthy, functioning estuarial ecosystem, typical of those found in the Southern coast of Puerto Rico and similar tropical environments." 456 F.Supp. at 1339.

## A.

The Commonwealth of Puerto Rico and the EQB instituted the present action on March 19, 1973, invoking the admiralty jurisdiction of the district court. A six–week trial, addressed solely to damages, commenced on November 7, 1977.[8] Plaintiffs first introduced testimony by expert witnesses on the impact of the oil spill on Bahia Sucia, the toxic effects of the oil, and the extent to which oil was still present four years after the spill. Other experts then presented proposals for restoring the area and testified to the costs that would be involved. Rafael Cruz Perez, an engineer, presented a proposal to remove and replace a total of 164,600 square meters (approximately 40 acres) of oil–contaminated sediments in the West Mangrove and East Mangrove areas to a depth of one meter. While the details of the Cruz Perez plan were somewhat sketchy, the geographic areas to be affected by the plan apparently consisted of the following. Of the 40 acres of contaminated sediments to be removed, about 15 acres were on the west side of the bay in the vicinity of West Mangrove and about 25 acres were on the east side in the vicinity of East Mangrove. Of the 15 acres

on the west side, about 3.5 acres contained mangroves, approximately half of which were alive notwithstanding the polluted sediments. Of the 25 acres to be removed on the east side, about 16.5 acres contained mangroves. Cruz Perez thus estimated his plan for removal of 40 acres of contaminated sediments would necessarily entail the clearing of some 20 acres of existing mangroves. Furthermore, Cruz Perez testified, three additional acres of mangroves in uncontaminated areas would have to be cleared to provide access for heavy machinery.[9] An engineering report submitted by Gabriel Fuentes, a contractor, estimated the cost of removing the sediments and mangroves to be $7,176,363.71. Charles Pennock, a San Juan nurseryman, submitted an estimate of $559,500 for the replanting of 23 acres of mangroves from container–grown plants (approximately 5,500 trees per acre) and a five–year maintenance plan.

Dr. Roger J. Zimmerman, a marine biologist from the University of Puerto Rico, testified concerning a study he conducted in late 1976 and early 1977 comparing the number of living organisms found at Bahia Sucia with the number found in a comparable control area. Dr. Zimmerman's study established no significant differences in number or type of organisms–either plants or animals–in the seagrass beds or on the prop roots of the mangroves. The study did, however, show a substantial disparity in the number of organisms living on or under the sediments. In particular, Dr. Zimmerman stated that the number of molluscs (e. g., clams, snails) in the Bahia Sucia area was very small in comparison to the control area. On the other hand, samples

---

enough in the record, and we will use them in the same fashion as the district court.

7. Indeed, the literal English translation of Bahia Sucia is "dirty bay."

8. On the first day of trial, the district court judge and counsel for the parties made an on–site visual inspection of the Bahia Sucia shoreline.

9. Cruz Perez testified that he made his calculations working from aerial photographs and from on–site observations. Cruz Perez's study

showed the size of the various impacted areas in numbers of square meters. We have translated these figures into numbers of acres for ease of reference. According to Cruz Perez's figures, there were a total of about 12 acres of mangroves in the West Mangrove area, of which about half were living mangroves in unaffected sediments. The figures suggest there were also about 2.5 acres of dead mangroves not impacted by oil. For a further discussion of the significance of these numbers, see note 25 infra.

taken in Bahia Sucia found a far larger number of polychaete worms, especially a genus known as capitella which often proliferates in areas of acute environmental distress.

Dr. Zimmerman also testified that, subsequent to this first survey, a second study was undertaken at the behest of the Environmental Quality Board. This study, again relying on core samples taken in Bahia Sucia and at a control site, concentrated on the sediments, where the first survey had found the greatest impact from the oil. Dr. Zimmerman stated that the surveyors took their samples primarily from the vicinity of a small lagoon in the West Mangrove area where previous studies and visual observation indicated the oil was heavily concentrated. This study revealed a marked difference between the two sites in the numbers of infaunal and epibenthic creatures, according to Dr. Zimmerman.

Dr. Ariel Lugo Garces, the wetlands expert, testified to studies he had made indicating the presence of oil in the mangrove sediments correlated with dead or dying mangrove trees. The mangroves would not grow back, Dr. Lugo said, as long as the oil remained in the sediments. Dr. Lugo also presented a compilation, prepared by him, of the data gathered by the other Bahia Sucia surveyors, summarizing the extent of damage to twelve different components of the Bahia Sucia ecosystem. Dr. Lugo stated that he considered his figures conservative, since little data was available on many other environmental components.

Finally, Dr. Philip E. Sorenson, an economist specializing in natural resources, discussed the economic theory that shippers of oil should be required to bear such external social costs as oil spill damages in order to prevent underpricing of their product. "If the producers and consumers of oil are able to conduct their affairs in such a way as to transfer to society a large part of the real cost of producing and consuming their product," Dr. Sorenson said, "we'll be in an inefficient economic situation: one in which

the market price of the commodity will be less than the full social cost of producing it." Dr. Sorenson also presented a summary of plaintiff's claims for damages, including inter alia the Commonwealth's uncontested claim for cleanup expenses of $78,-108.89, the $7.5 million for sediment removal and mangrove replanting, and Dr. Sorenson's own estimate of $5,526,583 as the replacement value of the invertebrate organisms killed by the oil spill.

Dr. Sorenson testified he arrived at the latter figure by way of the following calculations. Dr. Lugo's report had compiled the results of earlier studies together with the second Zimmerman survey to provide a table of environmental harms. Concentrating only on the figures from the Zimmerman study, Dr. Sorenson extrapolated the differences in number of organisms found in the ten–centimeter core samples over a square meter area to determine the net difference in creatures per square meter. Since six samples were taken at each of the four "stations" in Bahia Sucia and in the control area, he determined this involved multiplying the results of each set of six samples by 21.22. Results from one of the four stations, where more animals were found at Bahia Sucia than at the control area, were not included. The net difference was calculated to be 1,138 creatures per square meter. This figure in turn yielded the sum of 4,605,486 creatures per acre, and a total of 92,109,720 creatures of the 20 acres of mangroves allegedly impacted by oil. Dr. Sorenson testified that he took the 20–acre figure from "the survey and the map created by Mr. Cruz Perez" and that the 20 acres included a substantial area in East Mangrove.

To arrive at an estimate of damages, Dr. Sorenson testified he consulted catalogs from biological supply houses. From these catalogs he determined that "[m]any of these species sell at prices ranging from $1 to $4.50" and "that no animal on the list sold for less than 10 cents." [10] Dr. Sorenson

---

10. Dr. Sorenson did not testify that the biological supply houses actually procured specimens at Bahia Sucia or that the Bahia Sucia animals were marketable through such outlets. He

only stated that creatures similar to those killed could be replaced by purchasing them from the catalogs.

assigned an average replacement value to each creature, regardless of species, of six cents. Multiplying 92,109,720 times .06 resulted in an estimate of $5,526,583 as the replacement value of the organisms "missing" from the Bahia Sucia sediments. Dr. Sorenson also estimated the cost of a ten–year scientific monitoring program at $1,393,200. His total estimate of the damages was thus $14,733,755.60, consisting of $7,176,363.71 for mangrove and sediment removal, $559,500 for mangrove replanting, $5,526.583 for the replacement value of organisms, $1,393,200 for monitoring, and $78,108.89 for cleanup costs.

### B.

Plaintiffs' witnesses were thoroughly cross–examined by defendants' counsel. In addition, defendants presented considerable expert testimony of their own. The primary thrust of this testimony was that the oil originally present in Bahia Sucia had "weathered" through the action of wind, waves, sunlight and the elements and was no longer having major toxic effects on the environment. Defendants' experts also testified that some of the damaged mangroves were victims of pre–existing high salinity in West Mangrove rather than oil pollution. Further testimony indicated that, in the opinion of defendants' experts, there were substantial signs of natural regeneration among the mangroves. Dr. Edward S. Gilfillan testified, for example, that he expected the area to be restored by natural processes within ten to fifteen years, if not less. He estimated the size of the area of "continuing damage" in West Mangrove at two and a half to three acres.

Defendants also offered alternative restoration or reforestation programs of their own that were less extensive or less costly than plaintiffs' proposals. Dr. Howard Teas, a biologist, testified that, in his opinion, it would be possible, though not necessarily desirable, to remove oil from the sediments without destroying existing vegetation by using "an airlift or vacuum such as divers use in unearthing treasure ships." A preferable alternative, Dr. Teas said, would be to offset damage to the oil–impacted mangroves by replanting trees at a nearby location where the mangrove forest had existed several years before. This proposal would not carry with it the same risk of totally destroying the environment in the contaminated areas in order to save it, Dr. Teas said. He suggested that construction of a canal system to provide sufficient "flushing" action would permit reforestation of the area west of Bahia Sucia and north of the Cabo Rojo lighthouse where excess salinity had apparently killed the mangroves. Dr. Teas testified that the cost of replanting 15 acres of mangroves through methods with which he was familiar would be approximately $75,000 ($5,000 per acre), and that the cost of a ten–year monitoring program would be about $200,000.

Dr. Roger D. Anderson, a marine biologist testifying for defendants, attacked Dr. Sorenson's theory of replacement value as the measure of damages for small, commercially valueless invertebrate animals. Dr. Anderson offered as an alternative his own methodology, based on studies conducted in Georgia. Citing work done by some of plaintiffs' experts as well as other scientists, Dr. Anderson estimated the value of an acre of tropical mangrove swamp to be $50,000, based on a complex analysis of the potential significance of such land to food supply, energy supply, fisheries, wood products, aesthetics, recreation and similar factors. From his analysis of other evidence produced at trial, Dr. Anderson testified he considered about three acres of the West Mangrove area to be a total loss, thus producing a damage figure of $150,000. He stated, however, that his estimate of $50,000 was a "yardstick" which could be applied to any number of acres of mangroves that plaintiffs could show had been substantially damaged. Dr. Anderson pointed out that plaintiffs' expert Dr. Lugo had written a paper, on which Dr. Anderson

partly relied, putting a more conservative valuation of $35,000 to $40,000 per acre on the mangroves of Bahia Sucia.

Dr. Anderson also offered to testify in behalf of defendants' proposal that, as an alternative to massive replanting in the West Mangrove area, reforestation of the Cabo Rojo peninsula could be attempted. He stated that he was familiar with this technique of alternate–site restoration, and that it had been used in several states as a condition for permitting activities that would result in destruction of certain areas of marshland. Dr. Anderson's testimony on this point was excluded on grounds of irrelevancy. "I am involved here, solely, with establishing a dollar amount of damages," the court said. "[W]hether as an alternate remedy in the settlement, the restoration of other mangroves, or of these mangroves . . . could be proposed is outside the scope of this case; unless I am shown something to the contrary."

Finally, defendants presented testimony by David R. Stith, a marine contractor with experience in oil spill cleanup operations, including the Bahia Sucia cleanup. Stith testified he had prepared an estimate of the cost of removing the oil–contaminated sediments from 2.6 to 2.9 acres of the West Mangrove area using a suction device mounted on a floating barge. His estimate for this work totaled $396,859. Stith also offered to testify he had estimated the cost of constructing a channel system as proposed by Dr. Teas for replanting at the Cabo Rojo lighthouse. This estimate was $152,310. As with Dr. Anderson's, the district court excluded this testimony as irrelevant since it did not concern the damaged area. The total of defendants' proposed remedial measures was just under $1 million.

## C.

The district court made the following findings on the issue of damages:

"1. Plaintiffs' proven claim of damage to marine organisms covers an approxi-

mate area of about 20 acres in and around the West Mangrove. The surveys conducted by Plaintiffs reliably establish that there was a decline of approximately 4,605,486 organisms per acre as a direct result of the oil spill. This means that 92,109,720 marine animals were killed by the COLOCOTRONI oil spill. The uncontradicted evidence establishes that there is a ready market with reference to biological supply laboratories, thus allowing a reliable calculation of the cost of replacing these organisms.[42] The lowest possi-

[42] As explained previously, the affected flora and fauna were part of a trust held for the people by the Commonwealth of Puerto Rico. See, *Lacoste v. Department of Conservation*, 263 U.S. 545, 549, 44 S.Ct. 186, 68 L.Ed. 437 (1924); *Geer v. Connecticut*, [161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793], supra. Perforce, the Commonwealth must have the ability to have the corpus of said public trust reimbursed for the diminution attributable to the wrongdoers. *State Dept. of Environmental Protection v. Jersey Central Power & Light Co.*, supra, [124 N.J.Super. 97, 308 A.2d 671], at 673–674. We recognize that no market value, in the sense of loss of market profits, can be ascribed to the biological components of the Bahia Sucia ecosystem. The Court will thus refer to market cost as the most reliable evidence of the quantum of damages actually sustained, i. e., what is required to make the Plaintiffs whole. This will compromise the cost of restoring the affected areas to the condition in which they were before the occurrences. See *Feather River Lumber Co. v. United States*, 30 F.2d 642, 644 (C.A. 9, 1929)."

ble replacement cost figure is $.06 per animal, with many species selling from $1.00 to $4.50 per individual. Accepting the lowest replacement cost, and attaching damages only to the lost marine animals in the West Mangrove area, we find the damages caused by Defendants to amount to $5,526,583.20.

2. The evidence is overwhelming to the effect that the sediments in and around the West Mangrove continue to be impregnated with oil. The solutions proposed by Plaintiffs to this problem are unacceptable in that they would bring about the total destruction of this environment without any real guarantee of ultimate success. Furthermore, there is substantial scientific evidence to the effect that much of the undesirable effects

of the oil in the sediments will be corrected in time by the weathering processes of nature. The most affected spots in the West Mangrove cover an area of approximately 23 acres. It is the Court's opinion that these areas can best be reestablished by the intensive planting of mangrove and restoration of this area to its condition before the oil spill. The evidence shows that the planting of mangrove runs at about $16,500 per acre, thus bringing the cost of replanting 23 acres to $379,500. The evidence further demonstrates that the planting will require a five year monitoring and fertilizing program which will cost $36,000 per year or $180,000 for the five years. The total damages thus suffered by Plaintiffs by reason of the pollution of the mangrove in the West Mangrove amount to $559,-500.

3. Plaintiffs incurred in cleanup costs in the amount of $78,108.89 which were not reimbursed from any source, and they are entitled to recover said damages from Defendants.

456 F.Supp. 1327, 1344–45 & n.42 (D.P.R. 1978).

The judgment of the district court was entered August 22, 1978. During the pendency of their appeal from this judgment, defendants filed a motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b) [11] and for correction of the record pursuant to Fed.R.Civ.P. 60(a). These motions were denied in the district court by order dated August 10, 1979. Defendants' appeal from this order has been consolidated with the pending appeal of the original judgment.[12]

## II.

Defendants first contend the district court abused its discretion by striking their pleadings on the issue of liability and their petition for exoneration from and limitation of liability.[13] Defendants argue that this sanction—which amounted to a default judgment on liability and left open only the question of damages—was an unreasonably harsh penalty for any pretrial misconduct they may have engaged in.

The district court acted pursuant to Fed. R.Civ.P. 37(b), which provides that where a party has failed to obey a discovery order, the court "may make such orders in regard to the failure as are just, and among others the following:

"(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) *An order striking out pleadings or parts thereof,* or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party; . . . " (Emphasis added.)

The Supreme Court has stated that the appropriate standard of review for orders of this nature "is not whether this Court, or whether the Court of Appeals, would as an original matter have dismissed the action;

11. See *Commonwealth of Puerto Rico v. SS Zoe Colocotroni,* 601 F.2d 39 (1st Cir. 1979).

12. In light of our disposition of this case, we do not reach defendants' appeal from the district court's denial of their Rule 60 motions. On remand, defendants are free to resubmit to the district court such of the evidence supporting their Rule 60 motions as is relevant to the issues remaining to be decided.

13. The Limitation of Liability Act of 1851, 46 U.S.C. § 183, provides that in the event of an accident "incurred without the privity or knowledge" of the vessel owner, the liability of the owner for property damage "shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." Defendants petitioned pursuant to 46 U.S.C. § 185 to have their liability limited to $650,000—the amount deposited with the court as security for the vessel. For a discussion of the Act as it relates to oil pollution litigation, see Mendelsohn & Fidell, *Liability for Oil Pollution—United States Law,* 10 J.Mar.L. & Com. 475, 475–477 (1979).

it is whether the District Court abused its discretion in so doing." *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam); *see also Luis C. Forteza e Hijos, Inc. v. Mills,* 534 F.2d 415, 419 (1st Cir.1976). The question is whether the district court's findings "are fully supported by the record." 427 U.S. at 642, 96 S.Ct. at 2780.

In the present case, the district court found that defendants had exhibited "bad faith and a callous disregard of their responsibilities in this litigation." Defendants' conduct, which the district court characterized as "an affront to this Court's dignity," was found to have severely prejudiced plaintiffs' preparation of their case as well as the court's attempts to ensure that the trial proceeded as scheduled. These conclusions were based on the following facts, which appear in the record.

On June 7, 1977, the magistrate convened a status conference at which it was agreed by all parties that discovery in this long-pending case would be completed by August 1 in contemplation of a September 7 pretrial conference and a November 7 trial date. Depositions of the defendant corporations were scheduled to be taken in Puerto Rico on July 5, 6 and 7. A further status conference was slated for August 17. The depositions were duly noticed on June 13.

On July 5, 1977, without prior notice, defendants' corporate officials failed to appear for the scheduled deposition sessions. At plaintiffs' request, the magistrate convened an in–chambers conference the same day to consider what response to make. At that meeting, counsel for defendants stated that, contrary to the earlier agreement, his clients were only willing to be deposed in England in August. The court ordered defendants' counsel to ascertain by July 11 whether his clients would be amenable to appearing in Puerto Rico for depositions during the week of July 26. A second magistrate's hearing was set for July 11, at which time counsel for plaintiffs, if they so desired, were to move for sanctions and attorneys' fees.[14]

On July 11, 1977, the court was informed that the parties had agreed to reschedule the aborted depositions for August 3, 4 and 5, 1977, and that they would be conducted in Puerto Rico. The magistrate's hearing was cancelled and two days later the district court extended the discovery deadline to August 31, indicating that no further alterations in the pretrial schedule would be allowed. At the request of the United States, the depositions scheduled for August 3, 4 and 5 were eventually moved, with the consent of all parties, to August 17, 18 and 19. Appropriate notices were served August 10, and the court gave formal approval to the change on August 15.

On August 16, counsel for defendants, A. Santiago Villalonga, phoned counsel for the Commonwealth of Puerto Rico to inform him that defendants' witnesses did not intend to appear the next day. The witnesses' appearances would be superfluous, he said, because defendants intended to admit liability. This concession was repeated to the magistrate on the 17th of August by Francisco Bruno, who was substituting for Santiago as defendants' counsel at the status conference previously slated for that day. Like Santiago, Bruno asserted that the admission of liability obviated the need for taking further depositions.

At this time, counsel for the United States raised, among others, the question whether defendants' admission of liability extended to a waiver of defendants' petition to limit liability to the value of the vessel and cargo. When defendants' substitute counsel was unable to provide a clear answer, the magistrate ordered defendants to file a written admission of liability within fifteen days. The magistrate also agreed to reschedule the pre–trial conference from September 7 to October 25 and confirmed that the trial—now thought to be limited to the damages issue—would still commence on November 7.

---

14. Such a motion was in fact made, and on July 29, 1977, the court ordered defendants to pay $467.25 to the United States and $750 to the Commonwealth of Puerto Rico and the EQB. No appeal was taken from that order.

Defendants did not file a written admission of liability within fifteen days, as ordered, nor did they file any paper explaining their behavior. When the magistrate learned that no admission had been filed, he ordered a Some Disposition Conference for October 7, 1977 to determine the present status of the matter. At the conference, defendants' counsel stated, for the first time, that the August 17 admission of liability was neither authorized by all the defendant companies nor unlimited as to amount. Rather, said Santiago, the admission was intended to extend only to the amount of the bond for the vessel–$650,000. The magistrate thereupon ordered each defendant either to admit liability without limit as to amount–except for the limits of applicable insurance policies–by October 14, or to produce witnesses for deposition on October 17.[15] Defendants were explicitly warned that failure to comply with this order could result in the striking of their pleadings and of the petition for limitation of liability.

On October 14, 1977, instead of admitting liability, defendants moved for a postponement for one week of the depositions set for October 17, and a rescheduling of the pretrial conference slated for October 25. On October 17, plaintiffs moved the court to strike defendants' pleadings on liability, and a hearing before the magistrate was held the same day. After reviewing the

facts recited above in detail,[16] the magistrate recommended that defendants' pleadings on liability be stricken, or in the alternative that defendants pay $21,000 to the affected parties plus $500 for each day trial would be delayed by postponing the depositions, originally scheduled for July 5, to October 24. Following a hearing on October 20, the district court adopted the magistrate's recommendation that defendants' pleadings, and their petition for limitation of liability, be stricken.

We believe the record supports the district court's finding that defendants' conduct was inexcusably recalcitrant and that it materially prejudiced plaintiffs' trial preparation and the court's legitimate efforts to keep this protracted lawsuit moving forward. The fulcrum upon which this course of conduct turned was defendants' attempt at the August 17 status conference to avert the scheduled depositions by purporting to admit liability so as to make the depositions unnecessary. Had plaintiffs known the admission of liability was not meant to exceed the $650,000 already deposited in court, they plainly would not have acceded to the cancelling of the depositions. All the parties clearly understood that the "privity and knowledge" of the owners would be a major issue when plaintiffs sought to break defendants' petition for limitation of liability. The manifest pur-

---

15. Defendants now contend they misunderstood this order and believed the depositions were to be taken October 19. The record contradicts this assertion, however, as defendants' own contemporaneous submissions, with one exception, make reference to the October 17 date, and this is the date which appears plainly in the court's written order.

16. Though the magistrate did not explicitly cite earlier conduct of the defendants, plaintiffs assert that defendants' earlier conduct also evidenced their bad faith attitude toward the discovery process. On June 20, 1973, at the outset of the litigation, the court denied a motion by Vicente M. Ydrach, a San Juan attorney representing the West of England firms, to quash a notice of deposition and subpoena duces tecum issued June 5. Despite an order directing Ydrach to comply with the subpoena by June 23, he appeared at his deposition and refused to answer questions or produce docu-

ments on the ground of attorney–client privilege. Defendant West of England–Luxembourg was subsequently ordered to deposit all subpoenaed documents with the court so that the magistrate could separate those that were discoverable from those that were privileged. The magistrate's report was issued March 21, 1974. West of England filed eight motions for extension before finally submitting its objections to the magistrate's report on October 11, 1974. On September 17, 1975, the district court, adopting the magistrate's report, ordered West of England to produce the discoverable documents. The order was not obeyed. Plaintiffs moved for sanctions. After a hearing, the district court on November 7 repeated its order to West of England, noting that failure to comply within ten days would result in all pleadings and defenses being stricken, all motions being denied, and a default judgment being entered. This order apparently was obeyed.

pose of the depostitions scheduled for July 5, and later for August 17, was to explore the question of privity, and to try to establish defendants' knowledge of various alleged defects in the ZOE COLOCO- TRONE's navigational and safety equipment. If defendants intended to admit liability only within the limits of 46 U.S.C. § 183, even though they did not so state, then their assertion that further depositions would be unnecessary was highly misleading. plaintiffs sought to break defendants' petition for limitation of liability. The manifest purpose of the depositions scheduled for July 5, and later for August 17, was to explore the question of privity, and to try to establish defendants' knowledge of various alleged defects in the ZOE COLO- COTRONI's navigational and safety equipment. If defendants intended to admit liability only within the limits of 46 U.S.C. § 183, even though they did not so state, then their assertion that further depositions would be unnecessary was highly misleading. It had the effect of lulling plaintiffs into a false sense that the issue of liability was settled, at the same time the approaching trial date made it increasingly unlikely that sufficient time would be available later for full discovery to be conducted.

Nothing in defendants' conduct subsequent to August 17 in any way cured or mitigated the misleading effect of their purported admission of liability. Order to produce a written admission of liability, spelling out the details of their concession, within fifteen days, defendants made *no* formal response. Ordered again, following the Some Disposition Conference, either to admit liability in writing or to produce witnesses for deposition, defendants did neither, but instead at the last moment requested yet another delay. As we said under similar circumstances in affirming the dismissal of a case for want of prosecution, "There comes a point when the question arises who is running the court–counsel, or the judge. To this there can be but one answer." *Higuera v. Pueblo International, Inc.*, 585 F.2d 555, 557 (1st Cir. 1978).

Defendants insist the district court exceeded its discretion in striking their pleadings and preventing their defenses from becoming considered on the merits. They point out that the enforcement of procedural rules through punitive default judgments may offend the standards of due process. *See Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897). But the district court's response here was not purely punitive–or "mere punishment" in the words of *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351, 29 S.Ct. 370, 380, 53 L.Ed. 530 (1909); its actions bore a direct and reasonable relation to the prejudice defendants' irresponsible conduct had already created. *See* 4A Moore's Federal Practice ¶ 37.03[2.–1] at 37–56. Whether defendants planned all along to limit their unqualified admission of liability, or whether this idea arose as an afterthought, they gained a considerable strategic advantage by their misrepresentations. The district court could protect plaintiffs only by either further delaying trial or by holding defendants to their counsel's original unqualified admission of liability. The latter course, which the court adopted, was somewhat analogous to the imposing of an equitable estoppel. In the circumstances we see no violation of due process nor any abuse of the court's discretion. *See National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976); *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350–51, 29 S.Ct. 370, 379–80, 53 L.Ed. 530 (1909); *Luis C. Forteza e Hijos, Inc. v. Mills*, 534 F.2d 415, 419 (1st Cir.1976); *cf.* Note, *The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions*, 91 Harv.L.Rev. 1033, 1044–45 (1978).

### III.

Defendants next argue that the district court's attitude toward them was "poisoned" by the court's unwarranted reliance on depositions of the crew and master of the ZOE COLOCOTRONI to make unnecessary findings on the issue of liability, see 456 F.Supp. at 1333–36. Defendants con-

tend that the depositions, which were taken immediately after the vessel docked in Puerto Rico, were not properly introduced as evidence, and that they represented an attempt by the crew and captain to shift blame for the accident from themselves to the owners. Moreover, defendants argue, it was unnecessary for the court to make any findings on liability once it had stricken defendants' pleadings. The only purpose served by such findings, according to defendants, was to prejudice the court on the issue of damages.

We agree that the findings on liability were redundant. It would have been enough if the allegations in the complaint pertaining to liability had been taken as established. The depositions, moreover, had been received only in support of plaintiffs' claim for punitive damages, which was thereafter abandoned. But we are not persuaded that the court's consideration of extraneous liability matters caused undue prejudice or prevented it from fairly deciding the damages issue. As we sustain the court's striking of defendants' pleadings, nothing more favorable to defendants could have been found than was found on the issue of liability, and we do not think the record displays a judicial attitude that was "poisoned" against the defendants with respect to the issues that remained.[17]

## IV.

The West of England defendants, insurers of the ZOE COLOCOTRONI, argue the district court erred in asserting personal jurisdiction over them. The insurers maintain they are outside the reach of the District Court of the District of Puerto Rico because they have no office, sell no insurance, and purportedly transact no business in Puerto Rico. To sustain in personam jurisdiction over a foreign corporation, the court must find both that personal jurisdiction is authorized by the local statute and that the exercise of such jurisdiction does not violate the due process requirement that the nonresident defendant have certain "minimum contacts" with the forum state. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 289, 100 S.Ct. 559, 563, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). These contacts must be such that the assertion of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *Id., quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940).

Plaintiffs advanced two theories in the district court to justify in personam jurisdiction over West of England. First, plaintiffs argued that documents obtained from West of England's local law firm—Hartzell, Ydrach, Mellado, Santiago, Perez & Novas of San Juan, Puerto Rico (hereinafter Hartzell)—demonstrated that the Hartzell firm was actually West of England's "managing or general agent" in Puerto Rico, such that the firm was impliedly authorized to accept service of proc-

17. Defendants challenge one further aspect of the district court's findings. Based on the depositions and other exhibits of the crew and master, the court found that the owners knowingly and negligently permitted the ZOE COLOCOTRONI to depart Venezuela in an unseaworthy condition. In their brief, defendants assert that the standard marine insurance contract exempts the insurer from the duty to cover losses engendered by the owners' knowing use of an unseaworthy vessel. Defendants apparently have reference to Rule 30(b)(ii) of the "Rules and List of Correspondents" of West of England, which provides:

"Notwithstanding anything contained in Rule 15 or any other agreement between the Association and an insured Owner the insurance afforded by the Association shall not extend to liabilities, costs or expenses *attributable to the willful misconduct* of the insured Owner or his Managers." (Emphasis added.)

The insurers' argument is that it is inconsistent to hold them liable in light of the district court's findings as to the owners' degree of fault.

For purposes of this litigation, which involved no cross-claims between the insurers and the owners, it is enough to say that all the defendants' pleadings on liability were stricken—including the insurers' defenses based on the terms and conditions of the insurance contract. As we have herein upheld the striking of the pleadings, defendant insurers were properly barred from raising this defense against plaintiffs.

ess on West of England's behalf. *See* Fed. R.Civ.P. 4(d)(3); 2 Moore's Federal Practice ¶¶ 4.12, 4.22[1]. These documents consisted primarily of files of matters handled for defendants by Hartzell, pamphlets listing Hartzell as "correspondent" for defendants, and instructions issued to Hartzell on its duties as a correspondent. The files showed that Hartzell had, among other things, arranged on behalf of West of England and various insured owners for the burial of a deceased Egyptian sailor with appropriate religious observances, for the repatriation by air of several other sailors, and for numerous surveys and other investigations in connection with possible claims for damage or injury. The district court ruled, however, that these activities by Hartzell were so "substantially intertwined with Hartzell's primary professional functions" as defendants' retained law firm that it could not hold Hartzell to be a "managing or general agent" for purposes of accepting service of process on Hartzell's client.

Plaintiffs' second argument was related to the first, but had a narrower focus. Federal Rule of Civil Procedure 4(e) provides that, constitutional limitations aside, personal jurisdiction may be asserted over a nonresident defendant in the district court to the extent permitted by the long-arm statute of the state in which the court is sitting. *See* 2 Moore's Federal Practice ¶ 4.01[1]. Puerto Rico's long-arm statute is expressed in Rule 4.7 of the Puerto Rico Rules of Civil Procedure which provides, in pertinent part,

"(a) Where the person to be served is not within Puerto Rico, the General Court of Justice of Puerto Rico shall have personal jurisdiction over said nonresident as if he were a resident of the Commonwealth of Puerto Rico, if the action or claim arises as a result of the following:

(1) Such person or his agent carries out business transactions within Puerto Rico."

32 L.P.R.A., App. II, R. 4.7. Rule 4.7 "permits the exercise of jurisdiction to the full extent of constitutional authority," limited only by the due process analysis of *Interna-*

*tional Shoe* and succeeding cases. *Vencedor Manufacturing Co., Inc. v. Gougler Industries, Inc.,* 557 F.2d 886, 889 (1st Cir.1977). Plaintiffs argued below that West of England's business contacts with Puerto Rico— in particular, its regular writing of insurance covering vessels like the ZOE COLO-COTRONI, which visited Puerto Rico and operated within Puerto Rican waters—satisfied both the statutory and constitutional tests. The district court agreed.

We think this conclusion is correct. The essential constitutional question is whether West of England "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). The record makes clear that West of England did precisely that. The Hartzell files revealed numerous instances in which ships insured by West of England were involved in incidents giving rise to claims or potential claims while the ships were present in Puerto Rican waters. In each of these instances, West of England's local correspondent Hartzell was instructed to take actions to forestall claims, to provide services for the shipowners, or to prepare for any eventual litigation. West of England advertised to insured shipowners the fact that such services would be available through its local Puerto Rican correspondent. The contracts of insurance contained no provision preventing any ship from calling on Puerto Rico, or limiting coverage in the event it did. Not only do we know that vessels mentioned in the Hartzell files visited Puerto Rico, it stands to reason that many other West-insured vessels also did so, as the Hartzell files would name only vessels on which claims or other noteworthy incidents occurred. While West of England was not engaged in selling insurance in Puerto Rico, its retention of the Hartzell law firm to perform services for insured owners and vessels in Puerto Rico demonstrates that West of England plainly expected its worldwide business of insuring maritime risks to embrace the territorial waters of Puerto Rico with some regularity.

In certain ways, this case poses less difficulty than *American & Foreign Insurance Association [AFIA] v. Commonwealth Insurance Co.*, 575 F.2d 980 (1st Cir.1978), where we upheld the Puerto Rico district court's jurisdiction over two nonresident insurance companies operating out of Columbia. The district court in *AFIA* found that the insurance policy in issue covered a large volume of bottles regularly shipped from Columbia to Puerto Rico, and that one of these bottles injured plaintiff when it exploded. As the nonresident insurers knew from the terms of the policy both the volume of bottles being shipped and their destination, we held that the "companies' undertaking to insure a substantial subject of insurance in Puerto Rico was 'voluntary in [a] meaningful sense.'" *Id.* at 982, *quoting Vencedor Manufacturing Co., Inc. v. Gougler Industries, Inc.*, 557 F.2d 886, 891 (1st Cir.1977). There was no indication in *AFIA* that the insurance companies provided any substantial services to the insured bottler in Puerto Rico or that the insurers' contacts with Puerto Rico extended beyond this one series of transactions.

To be sure, as West of England points out, the record in the present case, does not indicate any explicit undertaking by West of England to insure vessels within Puerto Rican waters. But this fact, standing alone, does not suffice to distinguish the *American & Foreign Insurance* case. West of England plainly knew that vessels it insured would call on Puerto Rico from time to time, and it made no apparent effort to halt or limit this practice. In fact, by advertising the name of its local correspondent in San Juan, West of England affirmatively encouraged such commerce. This is not a case of a single isolated and unpreventable appearance of an insured vessel in Puerto Rican waters; the record shows such appearances were a readily foreseeable part of the normal course of business.

West of England contends, however, that its ability to foresee that insured vessels would enter Puerto Rican territorial waters does not, without more, satisfy the "minimum contacts" test of jurisdiction. The Supreme Court has recently stated that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980). In *Woodson*, plaintiffs brought a products liability action in Oklahoma against the regional distributor and the retailer of an automobile sold in New York but involved in an Oklahoma accident. The Court held Oklahoma's assertion of jurisdiction over the two New York corporations to be a violation of due process, since their only connection with Oklahoma was the fortuity that the car they sold passed through the state after it had left their hands.

"The foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State," the Court said. "Rather, it is that the defendant's conduct and connection with the forum is such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. at 567. The reason for this distinction, according to the Court, is the need to permit "potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.*

*Woodson* is distinguishable from the present case on two grounds. First, this is not a case of mere foreseeability, without more, that a single insured vessel would wander into Puerto Rico by happenstance. Plaintiffs established that vessels insured by West of England frequented Puerto Rico regularly over a period of years, and that they were provided with insurance-related services while there. West of England was unavoidably aware that it was responsible to cover losses arising from a substantial subject of insurance regularly present in Puerto Rico, a direct action jurisdiction. Second, the seller of a product such as the automobile in *Woodson* ordinarily has no control over where the buyer takes the product after it is sold. If the mere fortuity of the presence of the seller's product in another jurisdiction subjected the seller to

suit in that forum, the seller "would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel." *Id.* at 296, 100 S.Ct. at 566. By contrast, an insurer such as West of England has the power through its contracts of insurance meaningfully to influence the course taken by insured vessels. By limiting coverage to specified jurisdictions, West of England could be reasonably certain it would not be haled into court in an undesired forum. In other words, an insurer is not at the mercy of the insured owner's unilateral choice of destination in the same way a seller of chattels is at the mercy of the buyer.

■ Where, as here, the insurer has the means available to structure its primary conduct so as to control the area within which it will be subject to direct action, where it is undoubtedly aware that the objects of its policies are regularly present in a particular jurisdiction, and where it not only does not act to curtail such presence but actively promotes it by providing contractual services in the jurisdiction, we hold that such an insurer is amenable to personal jurisdiction in the forum.[18]

## V.

We now turn from procedural matters to the extremely difficult substantive issues concerning damages. Defendants challenge: (A) the so-called "standing" of Puerto Rico and the EQB to recover damages for environmental injury; (B) the district court's failure to limit damages by commercial or market value standards; and (C) the approach and data relied upon by the court in assessing damages.

### A.

We turn first to the issue of plaintiffs' right to bring this lawsuit. The district court held that the Commonwealth had "standing" to recover for damages to natural resources, namely the mangrove trees and the various species of marine creatures living in and around them, on the theory that the Commonwealth was the "trustee of the public trust in these resources" and had an interest in them as *parens patriae.* 456 F.Supp. at 1337; *see Maryland v. Amerada Hess Corp.,* 350 F.Supp. 1060 (D.Md.1972); *Maine v. M/V Tamano,* 357 F.Supp. 1097 (D.Me.1973); *In re Steuart Transportation Co.,* 495 F.Supp. 38 (E.D.Va.1980). The court also ruled that the Environmental Quality Board had standing to proceed as co-plaintiff seeking similar relief under a state statute authorizing the EQB to bring damages actions for environmental injuries. 456 F.Supp. at 1337; 12 L.P.R.A. § 1131 (29).

■ While the parties and the district court speak in terms of "standing," we think the question is more properly whether plaintiffs have stated a cognizable cause of action.[19] Defendants concede that Puerto Rico, as owner of the real property primarily affected by the oil spill, *see* 48 U.S.C. § 749, would, like any private landowner, have a cause of action in admiralty to recover whatever damages it could prove under conventional principles for its private economic loss as measured by diminution of market value in the coastal land. *See* 46 U.S.C. § 740. The Commonwealth made no attempt to show such damages, however. It seeks relief instead under an asserted right to recover as a governmental entity on behalf of its people for the loss of living

---

18. The result we reach is further buttressed by the Supreme Court's occasional suggestions that the test for measuring minimum contacts for insurance companies may be somewhat less stringent than for other nonresident corporations because of the forum state's public policy interest in promoting effective redress for injuries. *See McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957); *cf. Hanson v. Denckla,* 357 U.S. 235, 252, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Here the maritime accident resulted in injury to Puerto Rico's coastal environment, and plaintiffs represented this forum-related interest.

19. Plaintiffs' Article III standing is not challenged here, since, assuming plaintiffs have a valid cause of action, they clearly are the proper parties to raise it. *See Davis v. Passman,* 442 U.S. 228, 239 & n.18, 99 S.Ct. 2264, 2273–4 & n.18, 60 L.Ed.2d 846 (1979).

natural resources on the land such as trees and animals.[20]

Defendants contend that Puerto Rico's assertion of a recoverable interest in wildlife and other living natural resources is undercut by a line of Supreme Court cases culminating in *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). *See also Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977); *Toomer v. Witsell*, 334 U.S. 385, 402 & n.37, 68 S.Ct. 1156, 1165 & n.37, 92 L.Ed. 1460 (1948); *Missouri v. Holland*, 252 U.S. 416, 434, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920); *cf. Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896). In *Hughes*, the Court formally overruled *Geer v. Connecticut*, invalidating on Commerce Clause grounds a state ban on interstate transportation of wildlife lawfully caught in the state and completing the long erosion of *Geer's* theory of state ownership of wildlife. The court recognized, however, that states retain an important interest in the regulation and conservation of wildlife and natural resources. "[T]he general rule we adopt in this case makes ample allowance for preserving, in ways not inconsistent with the Commerce Clause, the legitimate state concerns for conservation and protection of wild animals underlying the 19th Century legal fiction of state ownership." 441 U.S. at 335–36, 99 S.Ct. at 1736. Later, the Court said, "We consider the States' interests in conservation and protection of wild animals as legitimate local purposes similar to the States' interests in protecting the health and safety of their citizens." *Id.* at 337, 99 S.Ct. at 1737.

Plaintiffs argue that a state regulatory interest in wildlife and other living resources, expressed metaphorically in the state's status as "public trustee" of its natural resources, is sufficient in itself to support an action for damages to those resources. *See, e. g., Maryland v. Amerada Hess Corp.*, 350 F.Supp. 1060, 1066–67 (D.Md.1972). Defendants reply that, absent a proprietary interest in the resource actually damaged, a state's unexercised regulatory authority over wildlife will not support a proper cause of action. *See, e. g., Commonwealth v. Agway, Inc.*, 210 Pa.Super. 150, 232 A.2d 69 (1967). We see no need to decide this difficult question in the present case. Here the Commonwealth of Puerto Rico, exercising its undisputed authority to protect and conserve its natural environment, has by statute authorized one of its agencies to maintain actions of this sort. Under the statute, 12 L.P.R.A. § 1131(29), co–plaintiff Environmental Quality Board has, among others, the following duties, powers and functions:

"(29) To bring, represented by the Secretary of Justice, by the Board's attorneys, or by a private attorney contracted for such purpose, civil actions for damages in any court of Puerto Rico or the United States of America to recover the total value of the damages caused to the environment and/or natural resources upon committing any violation of this chapter and its regulations. The amount of any judgment collected to such effect shall be covered into the Special Account of the Board on Environmental Quality."

20. We note at this point several questions which are not presented in this case, and on which we express no opinion. First, since the lands in question were all owned by Puerto Rico, we need not decide whether or in what circumstances a state might have a cause of action for environmental harm to privately owned land. Second, since the living natural resources in issue here were all attached more or less permanently to the land, we also do not decide whether any cause of action would accrue, and if so what remedies would be available, where more transitory forms of wildlife such as birds or fish were damaged. Third, this case does not present the issue of overlapping state and federal causes of action. While the Federal Clean Water Act of 1977 specifically stated that it did not preempt the imposition by a state of "any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State," 33 U.S.C. § 1321(o)(2), a problem of double recovery might be raised under some circumstances. Here, however, the United States made no claim for environmental damage (at the time this case arose there was no federal statute authorizing such an action) and asserted no legal interest in the affected lands. The interplay of the state cause of action asserted here with the federal remedial legislation discussed *infra* is an issue we therefore leave for another day.

We read this statute both as creating a cause of action of the type described by its terms and as designating the EQB as the proper party to bring such an action. We see nothing in *Hughes v. Oklahoma* or in the federal Constitution to prohibit such legislation. Whatever might be the case in the absence of such a local statute, we think that where the Commonwealth of Puerto Rico has thus legislatively authorized the bringing of suits for environmental damages, and has earmarked funds so recovered to a special fund, such an action must be construed as taking the place of any implied common law action the Commonwealth as trustee, might have brought. Any other construction would invite the risk of double recovery and lead to confusion as to the rights of the two state plaintiffs in their identical or nearly identical actions. It is unnecessary, therefore, for us to consider whether, had the legislature of Puerto Rico not delegated to the EQB the right to maintain such suits, the Commonwealth would have an inherent right to bring them itself.

Defendants assert, as a sort of last ditch rebuttal to this line of argument, that the present action is not authorized under section 1131(29), because plaintiff EQB failed to allege in the complaint "any violation of this chapter and its regulations." This assertion is erroneous. In the third amended complaint, plaintiff specifically alleged a violation of 24 L.P.R.A. § 595, which provides:

> "It shall be unlawful for any person, directly or indirectly, to throw, discharge, pour, or dump, or permit to be thrown, discharged, poured or dumped into the waters, any organic or inorganic matter capable of polluting or of leading to the pollution of said waters in such manner as to place them out of the minimum standards of purity that the Secretary of Health may establish under section 599 of this title."

This statute is explicitly made a part of Title 12, chapter 121 by 12 L.P.R.A. § 1132(b). The "minimum standards of purity" referred to in section 595 have been promulgated, and they make clear that any unauthorized discharge of petroleum into the waters—including the territorial waters—

of Puerto Rico is considered unlawful. *See* P.R.Rules & Regulations, Title 24, § 598–5. Defendants' challenge to the right of the EQB to maintain this action is thus without merit.

Equally unavailing would be any argument that this state statutory action is not cognizable in admiralty. An oil spill on the navigable waters is a breach of federal maritime law. *Maryland v. Amerada Hess Corp.*, 350 F.Supp. 1060, 1065 (D.Md.1972); *American Waterways Operators, Inc. v. Askew*, 335 F.Supp. 1241, 1247 (M.D.Fla.1971) (three–judge court), *rev'd on other grounds*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973); *California v. S. S. Bournemouth*, 307 F.Supp. 922, 926 (D.Cal. 1969). Where the injury occurs in the territorial waters of a state, the general rule is that admiralty will give "broad recognition of the authority of the States to create rights and liabilities with respect to conduct within their borders, when the state action does not run counter to federal laws or the essential features of an exclusive federal jurisdiction." *Just v. Chambers*, 312 U.S. 383, 391, 61 S.Ct. 687, 693, 85 L.Ed. 903 (1941). *See also Romero v. International Terminal Operating Co.*, 358 U.S. 354, 373–74, 79 S.Ct. 468, 480–81, 3 L.Ed.2d 368 (1959). Defendants do not argue, nor could they, that this action runs counter to the essential features of federal jurisdiction. *See Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 325, 36 L.Ed.2d 280 (1973).

### B.

Defendants next argue the district court erred in failing to apply the common law "diminution in value" rule in calculating damages. Under the traditional rule, the measure of damages for tortious injury to real property is the difference in the commercial or market value of the property before and after the event causing injury. *See* Restatement (Second) of Torts § 929(1)(a) (1979). Where the property can be restored to its original condition for a sum less than the diminution in value, however, the cost of restoration may be substi-

tuted as a measure of damages. *See, e. g., Big Rock Mountain Corp. v. Stearns–Roger Corp.*, 388 F.2d 165, 168–69 (8th Cir. 1968). Defendants introduced evidence at trial tending to show that the market value of comparable property in the vicinity of Bahia Sucia was less than $5,000 per acre, based on recent sales. Thus, defendants contend, damages here could not have exceeded $5,000 per affected acre even if the land were shown to have lost all value.

We believe that defendants have misconceived the character of the remedy created by section 1131. The EQB is not concerned with any loss in the market or other commercial value of the Commonwealth's land. In point of fact, the EQB concedes the land has no significant commercial or market value. The claim, rather, is for the injury–broadly conceived–that has been caused to the natural environment by the spilled oil. The question before us is not whether in a typical land damage case a claim of this sort could be successfully advanced–we assume it could not–but rather whether Puerto Rico's statute empowering the EQB to proceed in cases such as this envisions the awarding of damages on a different basis than would have been traditionally allowed.

The district court found that the once flourishing natural environment of the West Mangrove had been seriously damaged by the oil, to the point where some of the underlying sediments were no longer capable of supporting any but the most primitive forms of organic life, such as worms. The Puerto Rico statute authorizing this action specifically empowers the EQB to recover "the *total value* of the damages caused to the environment and/or natural resources" upon a violation of the anti–pollution provisions. 12 L.P.R.A. § 1131(29) (emphasis added). Implicit in this choice of language, we think, is a determination not to restrict the state to ordinary market damages. Many unspoiled natural areas of considerable ecological value have little or no commercial or market value. Indeed, to the extent such areas have a commercial value, it is logical to assume they will not long remain unspoiled, absent some governmental or philanthropic protection. A strict application of the diminution in value rule would deny the state any right to recover meaningful damages for harm to such areas, and would frustrate appropriate measures to restore or rehabilitate the environment.

This perception is confirmed by the course of recent federal legislation in the area of oil pollution. The Clean Water Act of 1972 provided that the United States could recover, up to certain pre–set limits, the costs it incurred in cleaning up after an oil spill, but made no explicit reference to environmental damages. Pub.L.No. 92–500, 92d Cong., 2d Sess. § 311, 86 Stat. 816 (1972), *codified at* 33 U.S.C. § 1321(f) (1976). The Clean Water Act Amendments of 1977 significantly expanded the scope of a vessel owner's potential liability. In particular, the federal government and the states were authorized to recover "costs or expenses incurred . . . in the restoration or replacement of natural resources damages or destroyed as a result of a discharge of oil or a hazardous substance." 33 U.S.C. § 1321(f)(4). Recoverable removal costs were defined as including the expense "of such . . . actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches." *Id.* § 1321(a)(8). The liability provision concluded:

> "The President, or the authorized representative of any State, shall act on behalf of the public as trustee of the natural resources to recover for the costs of replacing or restoring such resources. Sums recovered shall be used to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of the Federal government, or the State government."

*Id.* § 1321(f)(5).

Similarly, in the Outer Continental Shelf Lands Act Amendments of 1978, Congress provided that the government could recover damages for economic loss arising out of an

oil spill, including "injury to, or destruction of, natural resources," 43 U.S.C. § 1813(a)(2)(C), and "loss of use of natural resources," *id.* § 1813(a)(2)(D). The Submerged Lands Act, which forms the basis for the Outer Continental Shelf Lands Act, *see* 43 U.S.C. § 1811(9), defines "natural resources" as including, "without limiting the generality thereof, oil, gas, and other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life." 43 U.S.C. § 1301(e). While the latter acts do not, by their terms, apply to Puerto Rico, *see* 43 U.S.C. § 1301(g), like the Clean Water Act they do give some indication that Congress has determined that it is desirable to provide for environmental damages apart from the commercial loss, ordinarily measured by a market value yardstick, suffered by landowners and/or exploiters of natural resources. This perception is reinforced by the section of the OCS Lands Act which provides that sums the state recovers "shall be available for use to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies of . . . the State, but the measure of such damages shall not be limited by the sums which can be used to restore or replace such resources." 43 U.S.C. § 1813(b)(3).

 Especially in light of this recent federal statutory activity, we think that limitation of recovery to those damages recoverable under the common law "diminution in value" rule would be inconsistent with the manifest intent of Puerto Rico's environmental statute. In enacting section 1131, Puerto Rico obviously meant to sanction the difficult, but perhaps not impossible, task of putting a price tag on resources whose value cannot always be measured by the rules of the market place. Although the diminution rule is appropriate in most

contexts,[21] and may indeed be appropriate in certain cases under section 1131, *see infra,* it does not measure the loss which the statute seeks to redress in a context such as the present. No market exists in which Puerto Rico can readily replace what it has lost. The loss is not only to certain plant and animal life but, perhaps more importantly, to the capacity of the now polluted segments of the environment to regenerate and sustain such life for some time into the future. That the Commonwealth did not intend, and perhaps was unable, to exploit these life forms, and the coastal areas which supported them, for commercial purposes should not prevent a damages remedy in the face of the clearly stated legislative intent to compensate for "the total value of the damages caused to the environment and/or natural resources." 12 L.P.R.A. § 1131(29). In recent times, mankind has become increasingly aware that the planet's resources are finite and that portions of the land and sea which at first glance seem useless, like salt marshes, barrier reefs, and other coastal areas, often contribute insubtle but critical ways to an environment capable of supporting both human life and the other forms of life on which we all depend. The Puerto Rico statute is obviously aimed at providing a damages remedy with sufficient scope to compensate for, and deter, the destruction of such resources; and while we can see many problems in fashioning such a remedy, we see no reason to try to frustrate that endeavor. We therefore do not limit damages herein to the loss of market value of the real estate affected.

### C.

We turn now to whether the damages awarded by the district court were appropriate. To review the court's award, we must ascertain what a fair and equitable

---

**21.** The diminution rule has itself been limited in cases where the property has a special value to the injured party that is not reflected in its market value. *See, e. g., Rector, Wardens and Vestry of St. Christopher's Episcopal Church v. C. S. McCrossan, Inc.,* 306 Minn. 143, 235 N.W.2d 609 (Minn.1975) (and cases cited there-

in); Restatement (Second) of Torts § 929(1)(a) and comment b (1979). The principles later discussed as being applicable in cases like this one, such as attempting to ascertain the reasonable cost of restoration, are thus not so completely removed from traditional valuation theory as might, at first blush, appear.

damages measure would be in these circumstances, and, to that end, it will be helpful to examine the remedial provisions in recent similar federal statutes. There is a strong emphasis in Congressional oil pollution enactments on the concept of restoration. As discussed earlier, the 1977 Clean Water Act amendments provided that the state's representative, acting as public trustee, could "recover for the costs of replacing or restoring [natural] resources." 33 U.S.C. § 1321(f)(5). In accordance with the trust analogy, the statute provided: "Sums recovered shall be used to restore, rehabilitate, or acquire the equivalent of such natural resources by the appropriate agencies . . . ." *Id.* The legislative history further elaborates this standard:

> "New subsection (f)(4) and (5) make governmental expenses in connection with damage to or destruction of natural resources a cost of removal which can be recovered from the owner or operator of the discharged source under section 311. For those resources which can be restored or rehabilitated, the measure of liability is the reasonable costs actually incurred by Federal or State authorities in replacing the resources or otherwise mitigating the damage. Where the damaged or destroyed resource is irreplaceable (as an endangered species or an entire fishery), the measure of liability is the reasonable cost of acquiring resources to offset the loss."

House Conf. Rpt. No. 95–830, 95th Cong., 1st Sess. 92, *reprinted in* [1977] U.S. Code Cong. & Admin. News, pp. 4424, 4467.

Borrowing from the suggestion provided by this federal legislation, we think the appropriate primary standard for determining damages in a case such as this[22] is the cost reasonably to be incurred by the sovereign or its designated agency to restore or rehabilitate the environment in the affected area to is pre-existing condition, or as close thereto as is feasible without grossly disproportionate expenditures. The focus in determining such a remedy should be on the steps a reasonable and prudent sovereign or agency would take to mitigate the harm done by the pollution, with attention to such factors as technical feasibility, harmful side effects, compatibility with or duplication of such regeneration as is naturally to be expected, and the extent to which efforts beyond a certain point would become either redundant or disproportionately expensive. Admittedly, such a remedy cannot be calculated with the degree of certainty usually possible when the issue is, for example, damages on a commercial contract. On the other hand, a district court can surely calculate damages under the foregoing standard with as much or more certainty and accuracy as a jury determining damages for pain and suffering or mental anguish.

There may be circumstances where direct restoration of the affected area is either physically impossible or so disproportionately expensive that it would not be reasonable to undertake such a remedy.[23] Some other measure of damages might be reasonable in such cases, at least where the process of natural regeneration will be too slow to ensure restoration within a reasonable period. The legislative history

---

**22.** *See* note 20 *supra.* As we stated earlier, our holding is limited to circumstances such as these where the sovereign seeking to recover has an ownership interest in the real property where the environmental damage occurred.

**23.** "The technology available to remove oil and to restock plant and animal communities is very limited at present, and development of such a technology would be a long–range undertaking . . . . In most instances, the recovery of an ecosystem after an oil spill would occur, if at all, only through the slow processes of natural regeneration."

Wood, *Requiring Polluters to Pay for Aquatic Natural Resources Destroyed by Oil Pollution,* 8 Nat.Res. Lawyer 545, 598 (1976). If natural regeneration is likely to occur within a reasonable period, it is conceivable in some cases that this will be enough. Whether to award damages based on the cost of hastening restoration by artificial means will depend on a weighing of factors such as the feasibility and cost of the restoration plan, how long natural regeneration will take, how certain it is to occur, and how serious are the effects of a temporary absence of the damaged resources. There will doubtless be other factors we cannot now foresee.

of the Clean Water Act amendments, quoted above, suggests as one possibility "the reasonable cost of acquiring resources to offset the loss." *Id.* Alternatives might include acquisition of comparable lands for public parks or, as suggested by defendants below, reforestation of a similar proximate site where the presence of oil would not pose the same hazard to ultimate success. As with the remedy of restoration, the damages awarded for such alternative measures should be reasonable and not grossly disproportionate to the harm caused and the ecological values involved. The ultimate purpose of any such remedy should be to protect the public interest in a healthy, functioning environment, and not to provide a windfall to the public treasury.[24] In emphasizing the above measures, we do not mean to rule out others in appropriate circumstances. There may indeed be cases where traditional commercial valuation rules will afford the best yardstick, as where there is a market in which the damaged resource could have been sold that reflects its actual value. Much must necessarily be left to the discretion of courts, especially before a body of precedent has arisen.

■ But while the district court's discretion is extensive, we are unable to agree with the approach taken by the court here in placing a value on the damaged resources. Plaintiffs presented two principal theories of damages to the court. The first theory was somewhat analogous to the primary standard we have enunciated above, focusing on plaintiffs' plan to remove the damaged mangrove trees and oil–impregnated sediments from a large area and replace them with clean sediment and container–grown mangrove plants. This plan was estimated to cost approximately $7 million. The district court sensibly and correctly rejected this plan as impractical, inordinately expensive, and unjustifiably dangerous to the healthy mangroves and marine animals still present in the area to be restored. We can find no fault with the district court's conclusion that this draconian plan was not a step that a reasonable trustee of the natural environment would be expected to take as a means of protecting the corpus of the trust.

■ Plaintiffs' second theory, which the court accepted, focused on the supposed replacement value of the living creatures—the epibenthic and infaunal animals–alleged to have been permanently destroyed or damaged by the oil spill. Plaintiffs repeatedly disavowed any connection between this theory and an actual restoration plan. In other words, plaintiffs did not represent that they proposed to purchase 92 million invertebrate animals for actual introduction into the sediments, (which, being contaminated with oil, would hardly support them), but rather wished to use the alleged replacement value of these animals as a yardstick for estimating the quantum of harm caused to the Commonwealth. This theory

---

24. Other reasonable and scientifically credible means of estimating damages in circumstances where complete restoration is not possible may exist. Defendants presented testimony by Dr. Roger Anderson, for example, suggesting that there is some scientific basis for the placing of a dollar value on commercially nonvaluable property such as marshland by estimating the contributions such land makes to other valuable activities like fisheries or recreation. Moreover, a bill currently pending in Congress–the so–called Superfund Bill–would, if enacted, expand the capacity of the federal and state governments to recover damages for natural resources injured by oil or other hazardous substances. Damages would not be limited to restoration and related replacement costs, but would also include a dollar value based on "assessment" of the damage to the environ-

ment. Such an assessment would in turn be based on methodologies to be developed through rulemaking by three federal agencies: the Environmental Protection Agency, the Fish and Wildlife Service, and the National Oceanic and Atmospheric Administration. *See* S. 2083, 95th Cong., 2d Sess. § 5(e) (1978). For a more complete discussion of this proposed legislation, see DuBey & Fidell, *The Assessment of Pollution Damage to Aquatic Resources: Alternatives to the Trial Model,* 19 Santa Clara L.Rev. 641, 674–80 (1979). Since many of these methodologies are in their infancy, *see* Note, *Assessment of Civil Monetary Penalties for Water Pollution: A Proposal for Shifting the Burden of Proof Regarding Damages,* 30 Hastings L.J. 651, 674–79 (1979), we wish neither to endorse nor rule out altogether their use in appropriate cases.

has no apparent analog in the standards for measuring environmental damages we have discussed above. To be sure, the federal statutes from which we have borrowed speak in places of replacement as a part of the appropriate recovery. *See, e. g.,* 33 U.S.C. § 1321(f)(5). But we believe these references, in context, should be interpreted as meaning replacement as a component in a practicable plan for actual restoration. Thus, for example, if a state were seeking to restore a damaged area of forest, a portion of the damages sought might be allocated to replacement of wild birds or game animals or such other creatures as would not be expected to regenerate naturally within a relatively finite period of time even with appropriate restoration. This is a far different matter from permitting the state to recover money damages for the loss of small, commercially valueless creatures which assertedly would perish if returned to the oil–soaked sands, yet probably would replenish themselves naturally if and when restoration–either artificial or natural–took place.

The case primarily relied upon by the district court to support its grant of damages for replacement value is not to the contrary. In *Feather River Lumber Co. v. United States,* 30 F.2d 642 (9th Cir. 1929), the United States brought an action seeking damages for a public forest allegedly destroyed when defendant negligently started a forest fire and permitted it to spread onto public land. The government's chief witness, a Forestry Service official, stated that he calculated the extent of the fire damage by counting the damaged and undamaged trees on one–tenth acre sample plots located at intervals throughout the 4,000 acre area. The official separated his estimates into two categories, merchantable timber, as to which there was a present market value based on local stumpage prices, and young timber, as to which there

was only the possibility of future market value. The Ninth Circuit held that this method was proper as a means of estimating the extent of damage and that, as to the merchantable timber, "the measure of damages was the [market] value of the trees." *Id.* at 644. The court also held,

"As to young growth, while the measure of damages in such a case is ordinarily the difference in the value of the land before and after the fire, here, there being no law to authorize the sale of the lands injured by the fire, the trial court admitted such evidence as was available to show the damage actually sustained, that is to say, what was required to make the government whole, and this, we think, might properly include the cost of restoring the land to the condition in which it was before the fire."

*Id.* We think the quoted passage makes clear that the Ninth Circuit did not contemplate a purely abstract recovery such as that proposed here, where the theoretical "loss" was worked out in terms of what it would cost to buy thousands of creatures which, as a practical matter, would never be brought in such a manner and could not be expected to survive if returned to their damaged habitat. Rather, the Ninth Circuit was simply willing to permit the government to recover its actual and reasonable expected restoration costs based on the cost of replanting, a perfectly feasible and reasonable course of action in that case. Thus, leaving aside the question whether plaintiffs' evidence was sufficient to establish that 92 million creatures were destroyed and that six cents represented an appropriate replacement cost estimate, we are unable to endorse the theory of damages in support of which this evidence was advanced. We thus hold that it was error to award $5,526,583.20 for the replacement value of the destroyed organisms.[25]

---

25. Plaintiffs also offered a third claim for damages, which the district court accepted. This claim involved the estimate of $559,500 as the cost of replanting 23 acres with container–grown mangrove trees. Within the context of the evidence presented, and the other rulings made by the district court, we are unable to

understand its acceptance of this component of the damages. First, plaintiffs' experts clearly testified that the 23 areas included mangroves in both East Mangrove and West Mangrove, with the larger area being in the east. *See, e. g.,* note 9 *supra.* In light of the district court's finding that there was no significant damage in

## D.

We come finally to the disposition of this case. Defendants argue that, having rejected plaintiffs' damages theories, we should reverse the district court's judgment, except as to the Commonwealth's undisputed cleanup costs. While this is superficially an attractive course, we do not think the matter is quite so simple. To say that the law on this question is unsettled is vastly to understate the situation. The parties in this lawsuit, and we ourselves, have ventured far into uncharted waters. We do not think plaintiffs could reasonably have been expected to anticipate where this journey would take us. Though we have affirmed the district court's rejection of the Commonwealth's original, rather grandiose restoration plan, we believe the EQB should still have an opportunity to show, if it can, that some lesser steps are feasible that would have a beneficial effect on the West Mangrove ecosystem without excessive destruction of existing natural resources or disproportionate cost. The costs projected for the carrying out of such reasonable lesser steps would be an appropriate award of damages to the EQB. Plaintiffs may wish, at the same time, to reopen the question of alternative-site restoration, as to which the district court initially declined to take evidence, although we hasten to add that we do not now rule on whether the concept of alternative site restoration would make sense in this case as a measure of damages. We therefore, remand the case to the district court with instructions to reopen the record for further evidence on the issue of damages in line with our discussion of the principles governing recovery in cases of this sort.

Defendants cannot successfully claim that this disposition will prejudice their rights appreciably. Defendants themselves introduced evidence at the first trial on damages seeking to establish that restoration projects less extensive and less costly than plaintiffs' were possible. Had the district court accepted these proposals in lieu of plaintiffs', defendants would have had a potential liability of up to $1 million. We do not mean to suggest that plaintiffs are necessarily entitled to recover this, or any other, specific amount. Nor do we put any limits on defendants' right to contest any proposals put forward by the plaintiffs, or to offer counterproposals. In essence, while the court and the parties are entitled to rely on the record already developed to the extent they wish to do so, we think the record should be reopened on the issue of damages, with a renewed evidentiary hearing to be conducted in light of the standards for measuring such damages we have announced today. While we regret the necessity this will entail for further delay in this already protracted litigation, we trust that the district court, with the good faith assistance of the parties, will be able to carry out further proceedings without unreasonable delay.

To avoid any question that might be raised, *see O'Shea v. United States*, 491 F.2d 774, 778–80 (1st Cir. 1974), we note that we can see no reason why this case should not go back to the same district judge, who already possesses considerable familiarity with it.

*Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.*

---

East Mangrove, it is not clear why replanting of mangroves on that site was necessary at all. Furthermore, plaintiffs' experts also testified that the mangrove trees in the West Mangrove were dead or dying because of the presence of oil in the sediments. Replanting new trees in this same oil-soaked environment seems pointless if no attempt is to be made to counteract the effects of the oil. As we are remanding the case in any event, we think this award should be vacated pending a redetermination of the extent of the damage in West Mangrove and a further submission by plaintiffs integrating this proposal into a more reasonable plan, or set of alternative plans, for restoring the area.