Jane Alice PSARIANOS, et al.

v.

STANDARD MARINE, LTD., INC., et al.

Civ. A. No. B–84–298–CA.

United States District Court, E.D. Texas, Beaumont Division.

Oct. 30, 1989.

---

1. This court does not now rule that the death certificate has in fact been conclusively shown to be fraudulent.

439

C. John Caskey, Baton Rouge, La., for plaintiffs.

George W. Renaudin and Dan Caruso, Simon, Peragine, Smith & Redfearn, New Orleans, La., for Standard Marine, Ltd., Eagle Transport, Ltd. and Peter T. Kikis.

Thomas B. Greene, III, Crain, Caton, James & Womble, Houston, Tex., for American Bureau of Shipping.

Jack L. Albritton, Fulbright & Jaworski, Houston, Tex., for United Kingdom Mut. S.S. Assur. Ass'n and Thomas R. Miller.

## AMENDED MEMORANDUM OPINION

COBB, District Judge.

The M/V THOMAS K sank in international waters off the coast of Japan on February 1, 1984, with the captain plus a crew of fourteen. Plaintiffs and intervening plaintiffs in this case are the crew members and the survivors of the deceased crew members of the THOMAS K. They have filed personal injury and wrongful death actions against the vessel's owner, Eagle Transport Limited, Inc. (Eagle), its manager and operator, Standard Marine Ltd., Inc. (including Standard Marine (Hellas), Ltd.), alleged as the alter ego behind Eagle and Standard Marine, Peter T. Kikis, and the American Bureau of Shipping (ABS). Eagle, Standard Marine, and Kikis then instituted third party proceedings against the United Kingdom Mutual Steamship Assurance Association (Bermuda), Ltd. (a/k/a United Kingdom Protection and Indemnity Club) ("P & I Club" or "Club"), and its manager, Thomas R. Miller and Son (Bermuda) (Miller). In the third party complaint, Eagle, Standard, Marine, and Kikis claimed the Club and Miller breached a contract of insurance and sought indemnification for all sums they were required to pay to the plaintiffs.

The Club and Miller moved to dismiss the third party complaint, because of the third party plaintiffs' failure to state a cause of action, the lack of *in personam* jurisdiction over the third party defendants, and, pursuant to the contract of indemnity, the right to have the contract dispute arbitrated in London, England. These matters are now before this court. For the following reasons, third party defendants' motion to dismiss is denied in part and granted in part.

## I. BACKGROUND: THE SHIP, THE VOYAGE, AND THE SUIT

The M/V THOMAS K was owned by Eagle Transport, Ltd., a closely held Liberian corporation with its principal place of business in New York. Eagle's three principal officers, including Peter T. Kikis, its president, were and are all American citizens domiciled in New York.

Experiencing the world-wide deteriorating conditions in the shipping industry, Eagle decided to withdraw from the shipping

market in the late 1970s. Eagle began to sell its major assets, and by the early 1980s, the THOMAS K was the only ship remaining in its once large fleet. The industry continued to decline, and Eagle chose to sell the THOMAS K. It contacted brokers in New York who found a ready market for the vessel in the Far East. Eagle intended to sell the ship for its value as scrap metal after the voyage was complete.

The THOMAS K had been inactive and berthed in Port Arthur, Texas, since June 1982, and it was necessary to inspect the vessel and to reactivate it for its final voyage. Kikis, in his corporate capacity, contacted and hired Captain Emanuel Mylonakis to be the master of the THOMAS K. Captain Mylonakis subsequently hired a crew of Greek seamen to man the vessel. The American Bureau of Shipping (ABS), a marine classification society, was contacted in September 1983 to attend the vessel and make all necessary examinations and surveys, enabling the vessel to sail in class and in compliance with ABS's rules.

One of the requirements of ABS specified the vessel be brought for mandatory periodic drydocking every two and a half years. Eagle was willing to drydock the vessel in Port Arthur, Texas, if necessary, but ABS suggested and performed an underwater divers' inspection of the hull and tailshaft on October 11, 1983, in lieu of drydocking.

After issuing temporary certifications of the vessel's integrity and safety and informing Captain Mylonakis he had a "six-months' extension" of the drydocking requirement, ABS concluded its activities aboard the THOMAS K on December 8, 1983, and issued a compliance certificate for the ship's radio.

The last voyage of the THOMAS K began on December 10, 1983, destined first for Port Canaveral, Florida. The crew was limited to fourteen men, recruited by Captain Mylonakis. On December 15, 1983, the vessel docked in Port Canaveral where it began taking on a cargo of shredded scrap metal to be delivered to the Mitsubishi Corporation in Japan. The vessel then embarked for Japan on December 30, 1983, via the Panama Canal. On January 28, 1984, the THOMAS K encountered heavy seas in the North Pacific. Pounding seas and heavy weather caused the ship to experience a separation of the exterior shell (hull) plating near the bottom of the wing tank on the side of its No. 1 hold, and water entered. Emergency repairs were attempted at sea. On January 31, there was an explosion and fire in the vessel's engine room; over twenty hours were spent making repairs. The THOMAS K was without power while repairs were in progress, and in effect adrift. She drifted toward one of the Nagasota Islands, a small chain of islands in Japanese waters, when the captain attempted to re-route the ship to the Island of Shimizu. She came within thirteen miles of the Iro–Zaki light off the Izou Peninsula, but still within international waters. By February 1, 1984, the THOMAS K was in dire distress and imminent danger of sinking.

Although the Japanese Coast Guard offered assistance, Captain Mylonakis refused aid and even denied his own crew their request to abandon ship. The THOMAS K sank at 12:30 p.m. the same day, and the Japanese Coast Guard began rescue operations. During the two days the Japanese Coast Guard was on alert, a member of that Coast Guard was at the ready with a video camera in hand. He taped the last twenty minutes of the THOMAS K's struggle, breaking up, and sinking. These were available and shown to the court and jury during the trial. As a result of the sinking, eight crew members died, including Captain Mylonakis, and seven crew members survived but sustained varying degrees of injury.

When the THOMAS K sank, she had been entered with the United Kingdom Protection & Indemnity Club for insurance coverage for liabilities incurred by Eagle. The P & I Club was organized under the laws of Bermuda and retained Thomas R. Miller & Son (Bermuda) as its agent and manager in London, England. The contract of insurance was evidenced by the certificate of entry between the Club and

Eagle. The Club received immediate notice of the THOMAS K's loss, then instructed the law firm of Walker and Corsa, of New York and Hong Kong, to investigate the loss in anticipation of litigation. After examining reports prepared by Messrs. Walker and Corsa, the managers of the Club came to the view that the circumstances of the sinking might result in Eagle's exclusion of coverage for any and all claims arising from the loss. It appeared to the Club that coverage might be excluded under Rules 5(J), 5(K), and 5(L) of the Certificate of Entry. The rules are set forth in the footnote below.[1]

The Club and Eagle retained separate English and American counsel to conduct a further investigation of the loss. Based on this investigation, Miller gave Eagle formal notice on April 5, 1984, that the Club reserved its position regarding whether insurance coverage would be provided Eagle in the present case.

In May and October 1984, and January 1985, the directors of the Club discussed the subject of the THOMAS K. The directors analyzed reports and opinion letters from *all counsel* involved, and found that Eagle was in breach of Rule 5(K) by reason of the vessel's failure to comply with the requirements of the ABS. The directors declined to exercise their discretion under this rule to waive Eagle's alleged breach, and Eagle was so informed. The Club asserted Eagle's breach resulted in no coverage for liabilities incurred by Eagle as a result of the sinking of the THOMAS K.

Eagle's English solicitors then requested that the Club reconsider its denial of coverage. The matter was again submitted to the directors of the Club at its May 1985 meeting, and the directors refused to exercise their discretion to waive Eagle's breach of Rule 5(K) and again reserved the Club's other defenses under Rules 5(J) and 5(L).

The plaintiffs filed the present action on March 23, 1984, against Eagle, Standard Marine, and Kikis, based upon the unseaworthiness of the THOMAS K and the defendants' negligence under the general maritime laws of the United States and the Jones Act. ABS was subsequently brought into this suit as a defendant on a general negligence theory. Plaintiffs also sought punitive damages for willful, wanton, and grossly negligent conduct.

On November 7, 1985, ABS filed a separate cross-action against Eagle, Standard Marine, and Kikis, seeking contribution or indemnity if plaintiffs should recover from ABS. In turn, Eagle, Standard Marine, and Kikis filed crossclaims against ABS, alleging (1) when the THOMAS K set sail for Japan, Eagle reasonably believed it had done everything required by ABS to be in conformity with ABS rules and regulations, and (2) Eagle relied to its detriment on

---

1. Rule 5(J), which excluded coverage for "hazardous operations," was subsequently waived by the Club after it had had an opportunity to review the Rule's historical development.

Rules 5(K) and 5(L) provided as follows:
*Rule 5(K).* Classification of ship.
Unless agreed in writing between the Owner and the Managers [of the Club], the following conditions are terms of the insurance of every entered ship:
(i) The ship must be and remain throughout the period of entry classed with a Classification Society approved by the Managers, and
(ii) The Owner of the entered ship must promptly call to the attention of that Classification Society or the Society's surveyors any incident or condition which has given or might have given rise to damage in respect of which the Classification Society might make recommendations as to repairs or other action to be taken by the Owner, and

(iii) The Owner must comply with all the Rules, recommendations and requirements of that Classification Society relating to the entered ship within the time or times specified by the Society.
Unless and to the extent that the Directors otherwise decide, an Owner shall not be entitled to any recovery from the [Club] in respect of any claim arising during a period when that Owner is not fulfilling or has not fulfilled those conditions.
*Rule 5(L).* Rules subject to Marine Insurance Act.
These Rules and all contracts of insurance made by the [Club] shall be subject to and incorporate the provisions of the Marine Insurance Act, 1906, of the United Kingdom, and any statutory modifications thereof except insofar as such Act or modifications may have been excluded by these Rules or by any term of such contracts.
Club's Rules, Rules 5(K–L) (1983).

ABS's representations that the THOMAS K was in class and in compliance with ABS rules; therefore, ABS was estopped to assert such contention.

On December 3, 1985, Eagle, Standard Marine and Kikis filed their third party complaint against the Club and Miller, alleging *inter alia* that the third party defendants failed to honor the contract of insurance with Eagle. Before a trial on the merits of the main suit, the Club and Miller moved to dismiss the third party action. To avoid prejudice to the parties in the main suit, the third party action was severed, and assigned a different cause number.

The wrongful death and personal injury actions proceeded to trial on March 10, 1986. The Club's counsel sat (and stood at appropriate times) in the courtroom throughout the trial to determine whether a bona fide defense was being presented by Eagle. At the end of an eight-day trial, the jury returned a verdict for the plaintiffs in excess of $22,000,000 finding Eagle and ABS each fifty percent (50%) liable for plaintiffs' injuries and damages sustained by the decedents' representatives. Total compensatory damage awards by the jury to the various plaintiffs ranged from $113,-000 to $1,932,000. The jury also assessed punitive damages against Eagle and ABS in the amount of $3,000,000 each. The jury also found Eagle was not justified in believing it had complied with the regulations of the ABS, and could not rely on ABS's representations that Eagle had complied as such. In addition, the jury found ABS had waived the right to contend its regulations were violated by the THOMAS K.

Following the return of the verdict, the court dissolved its prior order of severance on June 9, 1986, and re-consolidated the third party action with the main suit. The companion case involving the loss of cargo aboard the THOMAS K, *Mitsubishi vs. P & I Club*, Civil Action B–86–160–CA, was also consolidated with the main suit for discovery purposes and is now consolidated for all purposes.

The directors of the Club met April 8, 1987, and reconsidered the case of the THOMAS K. The effect of the directors' decision is that the Club no longer relies upon Rule 5(J) as a defense in this case, but continues to rely upon Rules 5(L), 5(K)(ii) and 5(K)(iii).

All post-trial discovery is complete. The Club and Miller now re-urge the court to consider their motion to dismiss the third party complaint. The only remaining matters concern jurisdiction and the Club's right to arbitrate the remaining disputes.

## II. JURISDICTION: GENERAL AND SPECIFIC

To retain jurisdiction, the court must have personal jurisdiction over the Club as a non-resident defendant. The Fifth Circuit has held a two-step test to be applicable to determine whether a district court properly can exercise personal jurisdiction over a non-resident defendant. *Travelers Indemnity Co. v. Calvert Fire Insurance Co.*, 798 F.2d 826 (5th Cir.1987), *modified on rehearing on other grounds*, 836 F.2d 850 (5th Cir.1988). In *Travelers*, the court held:

> First, we determine whether the state would assert jurisdiction over the defendant. Second, we determine whether the defendant has minimum contacts with the state such that the traditional notions of substantial justice and fair play are not offended.

*Id.* at 832 (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Relating to the first step, Texas law on the assertion of *in personam* jurisdiction over a foreign corporation is stated in TEX. CIVIL PRACTICE & REMEDIES CODE §§ 17.042 and 17.044 (Vernon 1988). Texas courts, however, have interpreted this statute to extend to the limits of federal due process, the second step of the *Travelers* test. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413, 104 S.Ct. 1868, 1871–72, 80 L.Ed.2d 404 (1983). The only issue the court need decide is whether the second step has been satisfied—does the defendant have minimum contacts with the state such that the tradi-

tional notions of substantial justice and fair play are not offended?

■ The courts recognize two types of personal jurisdiction—"specific jurisdiction" and "general jurisdiction." "Specific jurisdiction" allows the court to exercise personal jurisdiction over a defendant when the cause of action is based upon and arises out of, or is related to the defendant's activities within the forum state. In this context, the minimum contacts inquiry focuses upon the relationship between the defendant, the forum, and the subject of the litigation. *Helicopteros*, 466 U.S. at 414, 104 S.Ct. at 1872. In such a case, the "fair warning requirement" of due process is satisfied if the defendant has "purposely directed" his activities at residents of the forum and litigation results from the alleged injuries that "arise out of or relate to" those activities. *E.g., id.; Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2181–82, 85 L.Ed.2d 528 (1985).

■ Where the cause of action does *not* arise out of or relate to the defendant's activities within the forum state, a court may nevertheless exercise "general jurisdiction" over the non-resident defendant when that defendant's "contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction." *E.g., Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

■ The central theme of due process is a determination of whether or not a non-resident defendant possesses a reasonable expectation that he could be sued in the forum state. This "reasonable expectation" or "fair warning" is satisfied in a "specific jurisdiction" case when the defendant directs his activities and conduct at the forum state and residents in that state, such that he should reasonably expect a suit arising out of those activities. In the "general jurisdiction" context, the "reasonable expectation" or "fair warning" re-

quirement is satisfied by the presence of the defendant's "substantial, or systematic and continuous contacts" with the state.

Simply stated, the issue is whether the Club had sufficient minimum contacts with Texas such that it could reasonably anticipate being sued in Texas on the claims of Eagle and Mitsubishi. The court finds there were sufficient contacts to satisfy this requirement.

### A.   General Jurisdiction

#### 1.   *Significant Contacts*

"General jurisdiction" over the Club essentially is based upon the following contacts with Texas: [2]

(1) From 1980 to the present, vessels operated by various member-insureds of the Club have regularly called at various Texas ports, almost on a daily basis.

(2) From May, 1979, to November 20, 1985, the Club issued and authorized security to plaintiffs or claimants in Texas for members of the Club in connection with Texas claims on 77 separate occasions. This security totaled over $19,711,760. These matters included claims arising out of cargo loss or damage, ship groundings, collisions, oil spills, dock damage, personal injuries, drug seizures, U.S. Coast Guard violations, and wave-wash surface and dock damages.

(3) From 1980 through February 6, 1986, partners and employees, Thomas R. Miller & Son, as well as employees of the Club's United States General Correspondent, Transport Mutual Services, Inc., visited Texas or were present in Texas for 50 days on behalf of the Club. These persons were in Texas for the following reasons: (a) to "market the TT Club," the Through Transit Club, (b) to visit the Club's correspondent agents, (c) to act in connection with Texas Casualties (specifically with a ship grounding in Texas, i.e., the ALVENUS), (d) to visit marine insurance brokers for business exploration and solicitation, and (e) to call on Texas

---

**2.** Eagle argued for jurisdiction based upon the "aggregate contacts" theory of federal jurisdiction. The Fifth Circuit in *Point Landing, Inc. v. Omni Capital International, Ltd.*, 795 F.2d 415, 426 (5th Cir.1986), *aff'd* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987) has rejected such theory.

Club members, including attending and conducting seminars.

(4) At least two Texas residents are entered in and members of the Club, i.e., Chiles Offshore, Inc., and Cliff Drilling Co.

(5) The Club pays its correspondent attorneys directly in Texas.

(6) The U.K. P & I Club maintained, on a regular and permanent basis, correspondent agent-attorneys in the State of Texas to represent their interests in order to provide the defense of claims against their "insureds" and "members," and to perform other services in the State of Texas on behalf of the Club and its insureds. The Club had correspondent agents in all major Texas ports. In this respect, the services of Messrs. Royston, Rayzor, Vickery & Williams, the Club's Houston, Galveston and Beaumont correspondents provided the following services:

a. Defended suits as legal counsel against the Club's members (insureds) and against seizure and arrest of Club entered vessels in Texas, or attempts so to do.

b. Arranged for the execution of surety bonds for release of vessels entered in the Club which were seized or arrested by the United States Marshal in Houston, Galveston, or Brownsville, Texas, or which were threatened with seizure or arrest.

c. In instances where claimants agreed to accept the Club's letters of undertaking in lieu of corporate surety bonds, the correspondent agents obtained authority for execution and issuance of such letters, and thereafter arranged execution and delivery of such letters to the claimants to prevent arrest or seizure of Club entered vessels in Texas. Such letters contained an undertaking or promise by the Club to abide by decrees of the United States District Court in Texas, including any appeals, and to pay U.S. federal court judgments in Texas cases up to the amounts stated in the letters of undertaking.

d. Conducted investigations of accidents and/or possible claims of damage or injury when vessels entered with the Club were involved.

e. Appointed marine surveyors and other maritime experts in cases of hull and cargo damage, personal injuries, pollution and other protection and indemnity insurance losses or accidents.

f. Assisted the local steamship agents in repatriating foreign seamen for Club entered vessels.

g. Arranged for medical services of the crew of Club entered vessels and assisted local steamship agents by recommending specialists.

h. Defended Club entered vessels against fines from the U.S. Customs and U.S. Immigration and Naturalization Services both on the local and appellate level (including on the respective Customs and I & N Boards of Appeal).

i. Arranged watchmen services to search for stowaways or assisted the ship's local steamship agents where necessary in this regard.

j. Attended seminars in Texas conducted by Transport Mutual Services, Inc., and partners and associates of Miller.

k. Received instructional pamphlets from the Club. From 1980 to present, such pamphlets or letter instructions were received from the Club or its managers or its New York General Correspondents.

The Club contends that the above listed Texas activities are far less significant than those which were present in *Helicopteros,* and do not approach the continuous and systematic activities required to satisfy the constitutional exercise of jurisdiction over the Club. The Club contends that neither the Club nor its manager, Miller, are licensed to do business in Texas, nor do they maintain any offices or bank accounts in Texas, own or lease any property in Texas, employ any agents or employees in Texas, or advertise in any Texas publication.

The Club further maintains the above listed contacts within Texas were not the contacts of the Club itself, but were those of the Club's members or correspondent agents; therefore, these contacts were not jurisdictionally significant and of no consequence in a due process analysis. *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

■ This court finds the Club's activities in Texas were significant, and provide sufficient contacts with Texas to establish "general jurisdiction" over the Club in Texas.

*In personam* jurisdiction over a foreign protection and indemnity club was addressed by a federal Court of Appeals in *Puerto Rico v. S.S. Zoe Colocotroni*, 628 F.2d 652 (1st Cir.1980) *cert. denied* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981). In *Zoe Colocotroni*, a ship entered with the West of England P & I Club with a cargo of crude oil and bound for Puerto Rico, ran aground on a reef near Puerto Rico, and the captain of the ship intentionally dumped 5,000 tons of crude oil, causing a massive oil spill fouling the beaches of Puerto Rico. The plaintiffs injured by the oil spill sued the vessel owner and also West of England P & I Club directly under Puerto Rico's direct action statute. Although West of England challenged the *in personam* jurisdiction of the Puerto Rico court, that district court held jurisdiction attached. The Court of Appeals affirmed, relying in part on the defendant's failure to limit coverage for ships traveling in Puerto Rican waters and in part the forestallment of claims by the defendant's correspondent in Puerto Rico.[3]

In *McKeithen v. M/T Frosta*, 435 F.Supp. 572 (E.D.La.1977), seventy-eight people died when a Norwegian vessel, insured by Skuld, a Norwegian P & I Club, collided with a ferry boat in the Louisiana waters of the Mississippi River. In the inevitable suit following the injury and death, claimants sued Skuld directly pursuant to Louisiana's direct action statute. Skuld contested *in personam* jurisdiction without success. Commenting upon port visits by vessels entered in Skuld, then District Judge Rubin stated:

> Over 4,500 ships are entered in Skuld, and they engage in worldwide trade. Many vessels entered in Skuld ply Louisiana waters regularly and repeatedly in the course of commerce between Louisiana ports and foreign countries. Within the past twelve months, for example, 44 such vessels entered the port of New Orleans, some of them several times. The Norwegian vessels entered in Skuld similarly travel the waters of practically every other American seaboard state and many other nations. The vessels that come into Louisiana waters do so as a result of their engaging in worldwide trade; their entry in Skuld is on that basis; Skuld does not invite their entry expressly or specifically for Louisiana.

*Id.* at 574.

In *McKeithen*, Judge Rubin found the actions of Terriberry, Skuld's counsel in New Orleans, to be significant enough to support his court's jurisdiction. He held:

> As Skuld's representative, Terriberry has arranged for medical services for members of the crew of a Skuld vessel, has obtained watchmen when necessary in problems relating to stowaways, and has executed bonds and letters of guarantee as a security to avoid the arrest of vessels. It receives reports of personal injuries on Skuld-entered vessels. It has also appeared in many admiralty and legal proceedings as counsel of record for Skuld and by virtue of this role, as counsel for Skuld-entered vessels.

*Id.* at 575.

After finding Skuld's contacts and those of Skuld-insured vessels, the court stated:

---

**3.** In so doing, the Court of Appeals stated:
The essential Constitutional question is whether West of England "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." [Quoting

*Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239–40]. The record makes clear that West of England did precisely that.
*See Zoe Colocotroni,* 628 F.2d at 668–69 for a full recitation of Hartzell's activities.

If Skuld did not transact business by Terriberry's acts ... it did so by Skuld's activities in regularly and repeatedly maintaining insurance on a host of vessels navigating Louisiana territorial waters.

*Id.* at 580.

Jurisdiction over a P & I Club was involved in *Travelers Indemnity Co. v. Calvert Fire Insurance Co.*, 798 F.2d 826 (5th 1987), *modified on rehearing on other grounds*, 836 F.2d 850 (5th Cir.1988). There, the EURYBATES, a vessel insured by a London Club, collided with the U.S.S. DAHLGREN, an American destroyer, off the coast of Panama. No specific jurisdiction was urged, and based on the evidence before the trial court, general jurisdiction was not shown. Because of distinct factual differences, however, between *Travelers* and this action, it is not controlling here. *Travelers* is essentially an evidence case because the plaintiffs failed to present enough evidence to sustain jurisdiction over the London Club.

In the present case, unlike *Travelers*, Eagle has produced ample evidence to establish the Club's general presence in Texas for the purpose of jurisdiction. *See* pp. 444–445, *supra.* Giving the appropriate weight to the relevant criteria, this court finds the Club has a sufficient number of contacts with Texas to subject it to "general jurisdiction" in Texas.

### 2. *Texas Forseeability*

Focusing on "forseeability," the Club contends that Texas was not a foreseeable jurisdiction where it might be sued. The Club contends that because in Texas there is no "direct action statute," where an insurance company can be sued directly by a plaintiff, there is no basis for a P & I underwriter to foresee being haled and hauled into a court of the United States in Texas because of its insured's activities.

■ This court holds the Club's position on foreseeability is wrong. The Fifth Circuit in *Travelers* did not distinguish *Zoe Colocotroni* and *McKeithen* by an analysis based on a direct action jurisdiction inquiry. The court in *Travelers* pointed out in detail all of the jurisdictional contacts present and proven in *Zoe Colocotroni* and *McKeithen* which were not present or proven in *Travelers*. This court holds the quantity and quality of minimum contacts, not the direct action statute, bears directly upon whether the P & I Club could reasonably anticipate being sued in Texas. Here, Eagle has carried its burden by supplying evidence on every point absent in *Travelers*. Therefore, the court finds the Club could reasonably anticipate being sued in Texas based upon these contacts.

The Club relies upon *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Bayou Steel Corp. v. M/V Amstelvoorn*, 809 F.2d 1147 (5th Cir.1987); and *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir.1987), to bolster its contention the Club could not reasonably anticipate being sued in Texas. But the First Circuit in *Zoe Colocotroni* has shown explicitly that the due process analysis in a stream of commerce products liability case such as *Woodson* is different from a case involving a foreign P & I insurer which provides insurance related services, for the P & I insurer has the power to affect its exposure contractually. *Zoe Colocotroni*, 628 F.2d at 669–70. Without a contractual exclusion, it follows that the insurer could reasonably foresee the likelihood it could be subjected to an interpleader action if a dispute arose over its duty to indemnify.

The Club knew its insured vessels almost daily frequented Texas ports; the Club insured Texas risks; and the Club should have known of the possibility of an impleader action if a dispute arose over its duty to indemnify. Therefore, the Club should have foreseen it could be subject to suit in Texas. Because of the continuous and systematic contacts of the Club to Texas, the court finds ample basis to hold "general jurisdiction" exists over the Club in Texas, and so holds.

### B. Specific Jurisdiction

■ "Specific jurisdiction" allows a court to exercise personal jurisdiction over a de-

fendant when the cause of action is based upon, arises out of, or is related to the defendant's activities within the forum state. *Helicopteros*, 466 U.S. at 414, 104 S.Ct. at 1872. In the case at bar, this court holds specific jurisdiction exists over the Club. The following activities are sufficient to confer jurisdiction over the Club:

1) The THOMAS K was in lay-up status at a berth in Port Arthur, Texas from July 14, 1982 through December 10, 1983, approximately one and a half years in Texas.

2) While the THOMAS K was in lay-up status in Port Arthur, the following events occurred:

a) An Egyptian seaman aboard the THOMAS K dove or fell overboard and drowned on July 17, 1982. The Club's correspondent attorneys in Texas arranged for settlement of funeral expenses and shipment of the body back to Egypt. As a result, the Club knew of the THOMAS K's presence in Port Arthur, Texas and could anticipate that, had a dispute arose over coverage, Texas could be a prospective forum state in a subsequent lawsuit.

b) A contract of insurance to be performed in whole or in part in Texas was entered into derivatively while the ship was in Texas. Although this does not mean that the original contract of insurance was entered into in Texas, once the THOMAS K went into lay-up status, the nature of the risks changed, premiums were reduced, and thereafter again, while in Texas, this status was further changed to reinstate full P & I coverage for additional premiums. The Club knew of the vessel's status at a Port Arthur, Texas, berth, the change represented a contract for Texas insurance coverage, even though the change in coverage and premiums was accomplished, as is customary for international marine insurance, through brokers outside Texas.

3) The Club's reasons for denying coverage relate directly and arise out of the alleged acts and omissions of Eagle and ABS which took place or failed to take place while the THOMAS K was in Port Arthur, Texas.

4) Other contacts exist which the *Travelers* court held to be applicable to a specific as well as to a general jurisdictional analysis, specifically: the number and frequency of visits by Club insured vessels to Texas; the extensive work of correspondent law firms; the presence of policy holders of the Club in Texas who pay premiums from Texas, and the Club's insurance of Texas related risks, including the THOMAS K in the present action.

The P & I Club contends that Eagle cannot "bootstrap" the Club into specific jurisdiction by reference to its own conduct in Texas which allegedly caused the loss of its insurance coverage. Such "unilateral activity" of a party claiming a relationship to the non-resident defendant was rejected as a basis for jurisdiction in *Helicopteros*, 466 U.S. at 417, 104 S.Ct. at 1873–74.

In this case, for the reasons stated, it was forseeable that the Club could be sued in Texas if coverage was denied on the basis of Eagle's negligent acts occurring in Texas. Because of the other numerous jurisdictional contacts of the Club in Texas, this court holds specific jurisdiction can be properly exercised over the Club.

C.  Fair Play and Substantial Justice

■ This court finds, in both a specific and general jurisdictional analysis, a Texas court's exercise of jurisdiction over the Club will not offend "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. Eagle has produced ample evidence of the Club's minimum contacts with Texas.

The plaintiff, Mrs. Psarianos, was a resident of the Eastern District of Texas when the THOMAS K joined Davy Jones' ever-expanding locker. Texas has an interest in protecting its own residents, and this is relevant to jurisdiction. *See DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1272 (5th Cir.1983).

The Club's counsel attended the entire trial of the case between the plaintiffs and

Eagle. Counsel insured a bona fide defense was being presented by Eagle. Other steps were taken by the Club to "protect its interests" in the litigation between the plaintiffs and Eagle and in this on-going litigation. The plaintiffs obtained a verdict against Eagle, and this court holds traditional notions of fair play and substantial justice would not be violated in this court's exercise of *in personam* jurisdiction over the Club.

## III. ARBITRATION

The validity of the arbitration clause is not questioned. The only issues relevant are (1) whether the Club has waived its right to arbitration by inconsistent conduct, and (2) whether the Club is estopped from asserting a policy defense under Texas law.

### A. Waiver

Alleging waiver, Eagle bears the burden of proof on this issue. "The burden of proof on one seeking to prove a waiver of arbitration is a heavy one." *Tenneco Resins, Inc. v. Davy International, A.G.*, 770 F.2d 416, 420 (5th Cir.1985) (quoting *Sibley v. Tandy Corp.*, 543 F.2d 540, 542 (5th Cir.1976), *cert. denied* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977)). A strong federal policy exists favoring arbitration over litigation as a means of private dispute resolution. *Seaboard Coast Line Railroad Co. v. National Rail Passenger Corp.*, 554 F.2d 657, 660 (5th Cir.1977). The Fifth Circuit has even stated:

> Moreover, where ... the party seeking arbitration has made a timely demand for arbitration at or before the commencement of judicial proceedings in the [trial court], the burden of proving waiver falls *even more heavily* on the shoulders of the party seeking to prove waiver.

*Tenneco Resins*, 770 F.2d at 420 (emphasis added) (quoting *Southwest Industrial Import & Export, Inc. v. Wilmod Co., Inc.*, 524 F.2d 468, 470 (5th Cir.1975)).

■ The legal test for waiver of arbitration requires conduct or activity inconsistent with the right to arbitration *and* prejudice to the party claiming waiver. *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 66 (5th Cir.1987); *Ohio Sealy Mat-*

*tress Mfg. Co. v. Kaplan*, 545 F.Supp. 765 (N.D.Ill.1982), *aff'd*, 712 F.2d 270 (7th Cir. 1983), *cert. denied* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983); *Demsey & Associates, Inc. v. S.S. Sea Star*, 461 F.2d 1009, 1017 (2d Cir.1972); *Seguros Banvenez, S.A. v. S.S. Oliver Drescher*, 761 F.2d 855, 862 (2d Cir.1985).

### 1. Conduct

■ Eagle pleads waiver because (1) the Club stated in a pre-litigation exchange of correspondence with Eagle, the directors' reservation of Rule 5K(iii) was not arbitrable, and (2) the Club refused to arbitrate that phase or any other phase of the dispute. Eagle therefore claims the Club has acted inconsistently and has waived arbitration.

Superficially enticing, Eagle's proposition fades away in the cold dawn of the morning after. Eagle never tried to invoke arbitration. There was no formal demand, no appointed arbitrator. Under Rule 40(B), the engagement of arbitration under the contract only comes into play "[i]f the Owner concerned in such difference or dispute does not accept the decision of the Directors." Club's Rules, Rule 40(B) (1983). The burden was clearly on Eagle to formally demand arbitration once the directors had rendered an adverse decision. Instead of commencing arbitration as it had proposed earlier, Eagle brought the matter into litigation in the United States. Accordingly, the Club never formally refused to arbitrate any dispute with Eagle, because there was no formal demand for arbitration.

It is clear that a party does not waive automatically its right to arbitrate by not demanding arbitration before the commencement of litigation. *General Guaranty Insurance Co. v. New Orleans General Agency, Inc.*, 427 F.2d 924, 929 (5th Cir.1970). Nor does a party's participation in a pre-litigation investigation of claims and subsequent settlement negotiations preclude its later reliance on contractual arbitration rights, when he who seeks arbitration relies upon the arbitration clause at the first opportunity, i.e., in its answer to

the opposing party's lawsuit. *Martin Marietta Aluminum, Inc. v. General Electric Co.*, 586 F.2d 143, 146 (9th Cir.1978).

The record shows the parties were merely involved in an inconclusive exchange of ideas over the arbitrability of the directors' discretion under Rule 5K(iii). During this exchange, the Club specifically declined Eagle's invitation of April 4, 1985, to waive the arbitration provisions and Eagle's breach of the Rules with respect to all potential defenses. The Club asserted at that time that it did not believe Rule 5K(iii) should be arbitrated because Eagle had admitted to the breach of this rule, and that there was, therefore, no "difference or dispute" arising "out of or in connection with these Rules" which would require arbitration. Club's Rules, Rule 40(A) (1983). When Eagle filed its third party demand, attempting to bring the Club and Miller into this litigation as third party defendants, the Club timely invoked the provisions of the contract pertaining to arbitration, and has not waived the same. Further, the third party demand in this case alleges that "The U.K. P & I Club and its London managers ... failed and refused to indemnify, protect and defend the M/V THOMAS K and its owner, Eagle, as required by the applicable contract of insurance." Third Party Demand, December 3, 1985, p. 5. That allegation clearly expresses a "difference or dispute between [the] Owner and the [Club] out of or in connection with ... the rights or obligations of the [Club] or the Owner thereunder...." Rule 40(A) (1983). Accordingly, there clearly is now an arbitrable dispute for which the Club has demanded arbitration.

The cases recognizing a waiver of arbitration rights by inconsistent conduct have mainly been in connection with a party's participation in litigation, as in circumstances where one has actively participated in a lawsuit or taken other action inconsistent with its right to refer a dispute to arbitration. Merely participating in litigation, or even commencing an action without more, however, has been held insufficient to constitute a waiver. *Merrill, Lynch, Pearce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 845 (2d Cir.1977). Even where a party seeking a stay of litigation pending arbitration did not move for the stay for some eight months following commencement of the litigation, raising the matter only in its answer to the complaint, and participating in discovery in the meantime, no waiver of arbitration was found. *Tenneco Resins*, 770 F.2d at 420. Other courts have allowed such actions as well as considerably more inconsistent activity without finding a waiver of the contractual right to arbitrate. *General Guaranty*, 427 F.2d at 929.

Eagle has failed to bring to the attention of the court any case in which the mere assertion, prior to formal demand for arbitration, that a controversy was not arbitrable, or that a party would not proceed to arbitration was sufficiently inconsistent conduct to justify a finding of waiver. The primary case cited by Eagle, *Farr Whitlock Dixon & Co. v. S.S. General Tsakalotos*, 244 F.Supp. 544 (S.D.N.Y.1965), does not apply.[4]

The mere exchange of views concerning the arbitrability of one of the issues between the parties in this case, where no formal arbitration has ever been commenced or demanded by Eagle, cannot even approach the conduct of the shipowner in *Farr Whitlock*, 244 F.Supp. 544.

---

**4.** In *Farr Whitlock*, 244 F.Supp. 544, at the formal demand of the defendant shipowner, the parties appointed arbitrators, and an arbitration panel was in fact convened. After some delay, the plaintiff wrote the shipowner, advising that he, too, was asserting a claim in the arbitration. The shipowner did not respond to the plaintiff's letter, and after several months, notified the arbitrators that the shipowner had decided to drop the matter. The arbitrators thereafter closed the hearings. Although the plaintiff attempted to have the arbitration panel reconvened, the shipowner resisted such attempts, and the arbitration panel was persuaded not to reconvene, which the shipowner had requested. The plaintiff thereafter brought suit against the shipowner, who promptly then moved for a stay pending arbitration. The court concluded that under the circumstances the shipowner had waived its right to arbitrate, and it was simply unfair to allow the shipowner to shift positions and to force arbitration upon the plaintiff under such circumstances.

## 2. *Prejudice*

Inconsistent conduct alone cannot amount to waiver. It is essential the party seeking waiver must prove prejudice as a result of such inconsistent conduct. As in *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir.1968), prejudice might be found if the party seeking arbitration had taken unfair advantage of discovery proceedings which would not have been available in arbitration. *Id.* However, it was there held, as well as in *Tenneco Resins*, 770 F.2d at 421, that where only a minimal amount of discovery had been conducted, which might also be useful for purposes of arbitration, no prejudice inferring waiver would be found. *Id.*

The Club had conducted no discovery on the merits until trial was imminent. However, it was subjected to extensive discovery on the merits by affirmative order by this court in favor of Eagle and the other parties to this litigation, which they themselves could not have obtained if this matter were in arbitration. Thus, Eagle has not been prejudiced in this regard.

A finding of prejudice may also be predicated upon extensive additional costs of litigation in preparing for trial. However, Eagle was put on notice of the Club's desire to arbitrate when it filed its Rule 12(b) motion. Indeed, in *Tenneco Resins*, 770 F.2d at 421, where the defendant had raised arbitration rights in its answer, but had failed to move for a stay pending arbitration for five months thereafter, during which time interrogatories had been issued and answered, and various other discovery had been conducted, there was no finding of prejudice. *Id.* The Club has consistently requested this court to grant its Rule 12(b) motion to dismiss or stay this litigation.

This court finds lacking both inconsistent conduct by the Club and prejudice against Eagle.

## B. Tilley

Eagle argues the Club is estopped to urge arbitration as a defense on the basis of *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552 (Tex.1973). In *Tilley*, an insurance company hired an attorney to represent its policyholder, Joe Tilley, in a personal injury suit. In addition to defending Tilley, the attorney hired by the insurance company worked for nearly eighteen months to develop a late-notice policy defense for the insurance company. The attorney took statements from Tilley's employees, and sent evidence, information, and briefs to the insurance company at its request on the late-notice question. All this was done without Tilley's knowledge, at the request of the insurance company, and was, under the prevailing Texas law, an ethically acceptable practice. *Id.* at 554–55.

After this information was developed, the insurance company filed a declaratory judgment action against Tilley, seeking a determination that the late notice by the insured relieved it of any obligation to defend the personal injury suit. *Id.* at 555. After reviewing the obligations owed by attorneys hired by insurance companies to defend named or additional insureds, the court concluded that the insurer was estopped from denying its responsibilities for the defense of Tilley. *Id.* at 561.

Several differences, however, exist between *Tilley* and the case at bar. First, a protection and indemnity association is not a traditional insurance company; it is a group of shipowners who have agreed to insure one another's vessels for the mutual benefit of all. Eagle is a member of the Club, not simply an insured; and the coverage provided is indemnity, rather than liability. There is no duty to defend, although coverage does include reimbursement for defense costs.

Unlike the investigation in controversy in *Tilley*, which was undertaken simply to develop the late-notice policy defense, at the heart of this investigation was the issue of the vessel owner's potential liability for negligence and unseaworthiness of the vessel. These issues were critically important for the personal injury and death claims. In addition, under the Carriage of Goods by Sea Act (COGSA), 44 U.S.C.App. § 1300, *et seq.*, and the charter party in this case, the vessel owner is liable for cargo damage caused by his failure to exercise

due diligence to provide a seaworthy vessel. Also, the vessel owner's ability to limit its liability pursuant to the Limitation of Liability Act, 46 U.S.C.App. § 181, *et seq.*, at least as to the cargo claims, depends upon the vessel owner's privity, or knowledge of the conditions which led to the casualty.

Because the condition of the vessel was critical in evaluating the vessel owner's potential liability for unseaworthiness, the ABS records, which are the usual source of information bearing on a vessel's condition, became the logical source of evidence bearing on the seaworthiness of the THOMAS K. This documentary information ultimately became available to all parties by ABS after the initiation of discovery proceedings in this case.

The vessel owner's potential liability and his ability to limit his liability were the only subject of Walker and Corsa's investigation. This is clearly seen from a letter to the Club on February 6, 1984, sent to Eagle by the Club on that same day:

> The oral testimony, the potentially sworn statements of crew members, suggest that the vessel was unquestionably unseaworthy at the time of the commencement of the voyage from Port Everglades. This "fact," if subsequently demonstrated to the satisfaction of the court and coupled with the testimony that the shipowner knew of the ship's condition, will result in a denial of limitation and assessment of liability for such damages as may be proven.

Letter from Walker and Corsa to the Club (Feb. 6, 1984).[5]

Here, Walker and Corsa first reported the findings of their investigation to the

Club on February 6, 1984. A copy of this letter was sent by the Club to Eagle on the same day. On February 7, 1984, Walker and Corsa telexed a preliminary report to the Club. On February 9, 1984, the Club advised Eagle that it was reserving its position on coverage. Walker and Corsa's report of February 10, 1984, was sent to both Eagle and the Club. The deficiencies in the vessel's condition were reported by Walker and Corsa to Eagle and the Club on February 6, 1984, and February 10, 1984. At no time in any of its reports did Walker and Corsa address coverage, or even mention the Club's Rules relating to vessel classification. Their investigation concentrated on liability, not coverage. If Eagle was uninsured, and it retained lawyers on its own to investigate this casualty, its lawyers would have done exactly as Walker and Corsa did.

Eagle fails to allege conduct on the part of the Club which would amount to a violation of *Tilley*. The information obtained in the course of the investigation was given both to Eagle and to the Club. Walker and Corsa's assignment was to investigate liability. The Club never asked Walker and Corsa, directly or indirectly, to investigate any coverage questions. Walker and Corsa's reports expressed their findings in terms of Eagle's potential liability. Nowhere is coverage or the Club's Rules mentioned. It was the Club that notified Eagle of the potential coverage problem within eight days of the casualty, after which, the Club engaged separate counsel; Walker and Corsa did not continue to represent either party. Moreover, Eagle has not been prejudiced by the actions of the Club or Walker and Corsa. The primary infor-

---

**5.** Besides examining the conduct of the investigating attorneys, the court in *Tilley* approved the American Bar Association National Conference of Lawyers and Liability Insurers' "Guiding Principles," including the following:

> IV. CONFLICTS OF INTEREST GENERALLY—DUTIES OF ATTORNEY.
> In any claim or in any suit where the attorney selected by the company to defend the claim or action becomes aware of facts or information which indicate to him a question of coverage in the matter being defended or any other conflict of interest between the

company and the insured with respect to the defense of the matter, the attorney should *promptly* inform both the company and the insured, preferably in writing, of the nature and extent of the conflicting interest....

*Tilley*, 496 S.W.2d at 559 (emphasis added) (quoting "National Conference of Lawyers and Insurers—Guiding Principles," 20 FED'N.INS. COUNS.J. 95 (1970)). In particular, the court in *Tilley* expressly disapproved of the insurer's attorney working *against* the insured for nearly eighteen months without notice to the insured. *Id.* at 561.

mation regarding the vessel's overdue surveys was determined from ABS records and personnel, not from Eagle. Those records would have become available during the proceedings, and Eagle cannot now argue that it was prejudiced simply because the records were obtained sooner, rather than later.

## IV. RECAP

First, this court finds Eagle has met its burden of producing sufficient evidence to establish the Club's minimum contacts with Texas. Jurisdiction over the Club will not offend traditional notions of fair play and substantial justice in that the Club could anticipate being hauled into a Texas court given the Club's activities in Texas, under the factual circumstances of the present case.

The court finds Eagle has not met its burden of showing a waiver of the arbitration provisions, nor has Eagle shown conduct by the Club's attorneys which would result in a striking of policy defenses under *Tilley*. Accordingly, this court finds further proceedings in this case should and shall be stayed pending final arbitration of this in London under Club's Rules.